**UNITED STATES of America,**
**Appellant**

v.

**Gilberto MARTINEZ.**

No. 89–5710.

United States Court of Appeals,
Third Circuit.

Argued Jan. 22, 1990.

Decided June 19, 1990.

James J. West, U.S. Atty., Gordon A.D. Zubrod, William A. Behe (Argued), Asst. U.S. Attys., Harrisburg, Pa., for appellant.

Yvonne A. Okonieski, Anthony R. Sherr, Sherr, Joffe & Zuckerman, P.C., West Conshohocken, Pa., Carter G. Phillips, Mark D. Hopson (Argued), Juli E. Farris, Sidley & Austin, Washington, D.C., for appellee.

Before SLOVITER, HUTCHINSON, and COWEN, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

Gilberto Martinez, the appellee, was convicted under the mail fraud statute for his participation in a scheme to fraudulently obtain for a co-conspirator a medical license from the Commonwealth of Pennsylvania. After serving his sentence, Martinez filed a writ of error *coram nobis*, seeking to vacate his conviction on the ground that the Commonwealth was not deprived of property within the meaning of the statute. The district court granted the writ, from which the government appeals. We have jurisdiction pursuant to 28 U.S.C. § 1291.

### II.

*Facts and Procedural History*

Martinez does not deny that he assisted Brian Murach, who is not a party to this appeal, to fraudulently obtain from the Commonwealth of Pennsylvania a license for Murach to practice medicine. Murach, who was a medical student in Mexico, paid Pedro de Mesones to arrange his admission to the Universidad Centro de Estudios Tecnologicos (CETEC), a private medical school in the Dominican Republic, based in part on courses Murach purportedly took at

a Mexican medical school, and to assist Murach in obtaining a fraudulent medical degree from CETEC, based on forged documents falsely indicating that Murach had completed the 72–week clinical rotation required for graduation. Murach received his degree from CETEC in June 1983.

Martinez participated in this scheme by obtaining forged transcripts representing that Murach had attended the Universidad Valle Del Bravo in Reynosa, Mexico for four semesters when, in fact, Murach had never attended that University and had attended a different institution, Universidad del Noreste School of Medicine, for only two semesters. Martinez sent the fraudulent transcripts through the United States mails to de Mesones sometime in August 1983, and Murach subsequently included these transcripts in his application for a permanent license to practice medicine in the Commonwealth.

Murach was then accepted into a family practice residency program at the Delaware County Memorial Hospital in Pennsylvania after passing the examination for the Educational Commission for Foreign Medical Graduates, which is given to all graduates of authorized foreign medical schools seeking to practice in the United States. After completing his one-year residency, Murach passed the Federation Licensing Examination (FLEX), and obtained a permanent license to practice medicine in the Commonwealth.

On July 12, 1984, a federal grand jury returned an indictment against Martinez and Murach. Murach was charged with seven counts of mail fraud under 18 U.S.C. § 1341 and one count of conspiracy to commit mail fraud under 18 U.S.C. § 371. Martinez was charged with one count of conspiracy to commit mail fraud under 18 U.S.C. § 371. The indictment specifically charged Martinez with the overt act of "sen[ding] through the United States Mail an envelope containing original transcripts from Valle de [sic] Bravo in Brian Murach's name to Pedro Mesones." App. at 33–34. The indictment charged that the substantive offense underlying the conspiracy was

a scheme and artifice to defraud the Commonwealth of Pennsylvania and its citizens by obtaining a license to practice medicine in the Commonwealth of Pennsylvania, by means of false and fraudulent pretenses, representations and promises to the Commonwealth of Pennsylvania, State Board of Medical Education and Licensure, the defendant well-knowing that said representations were false and fraudulent when made.

App. at 19.

Following a jury trial, Martinez and Murach were convicted on December 17, 1984 of all counts charged in the indictment. Martinez' post-trial motion for a new trial was denied, and he was sentenced on June 25, 1985 to two years' probation and 400 hours, later reduced to 200 hours, of community service. This court affirmed Martinez' conviction.

On June 24, 1987, the United States Supreme Court decided *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), holding that the mail fraud statute applies only to schemes to defraud victims of money or property, and does not apply to schemes to defraud the state and its citizens of their intangible right to have the government's affairs conducted honestly. Martinez filed a motion for a writ of error *coram nobis* on March 10, 1989, claiming that his conviction was invalid because it was based on the theory held to be impermissible in *McNally*.

The district court granted Martinez' writ of error *coram nobis* on July 24, 1989. The court first noted, following settled precedent in this circuit, that *McNally* should be applied retroactively. It next posed the question of whether "Martinez's conviction [was] inextricably linked to a scheme to defraud a victim of money," and concluded, relying on *United States v. Kato*, 878 F.2d 267 (9th Cir.1989), and *United States v. Murphy*, 836 F.2d 248 (6th Cir.), *cert. denied*, 488 U.S. 924, 109 S.Ct. 307, 102 L.Ed.2d 325 (1988), that a "license is not property until issued and therefore a scheme to defraud government of licenses is not covered by the mail fraud statute." App. at 89. The court concluded

that Martinez had not waived his right to *coram nobis* relief by failing to appeal the intangible rights theory charge because at the time of his conviction it was well-established in our circuit that such a theory was permissible under the statute.

The government filed this timely appeal.[1] Our standard of review is plenary, as we must determine whether fraudulently obtaining a medical license from the state falls within the purview of the mail fraud statute. *See Chrysler Credit Corp. v. First Nat'l Bank and Trust Co.*, 746 F.2d 200, 202 (3d Cir.1984).

## III.

### Discussion

The mail fraud statute proscribes, *inter alia*, conduct "devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341 (1988).

The government presented its case on the theory, clearly pled in the indictment, that Martinez' participation in the scheme to defraud the Commonwealth of Pennsylvania and its citizens of a medical license violates the mail fraud statute. The government contends that this theory is permissible because a license is "property" within the meaning of that statute. Martinez, on the other hand, argues that although an issued license might be property in the hands of the licensee, an unissued license in the hands of the Commonwealth is not property for purposes of *McNally*. He argues that because the state was not deprived of property within the meaning of the mail fraud statute, his conviction cannot stand.

The issue in *McNally* was a different one. McNally and a former Kentucky official were convicted of mail fraud for their participation in a scheme with the Chairman of the Kentucky Democratic Committee to purchase a workmen's compensation

policy for the Commonwealth of Kentucky through an insurance agent in return for the payment of a portion of its commissions to the defendants or their designees. The theory of the prosecution was that the "self-dealing patronage scheme defrauded the citizens and government of Kentucky of certain 'intangible rights,' such as the right to have the Commonwealth's affairs conducted honestly." 483 U.S. at 352, 107 S.Ct. at 2877. The Supreme Court, overturning a series of lower court decisions to the contrary, held that although the history of the mail fraud statute suggests it should be broadly read to protect property rights, it "does not refer to the intangible right of the citizenry to good government." *Id.* at 356, 107 S.Ct. at 2879.

The scope of the *McNally* decision was soon clarified in *Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987). A Wall Street Journal columnist and a securities broker were convicted of mail fraud based on the columnist's periodic release to the broker of confidential pre-publication information of the timing and contents of the column. Defendants' argument that the mail fraud charge could not be sustained in light of *McNally* was rejected by the Supreme Court, which explained "*McNally* did not limit the scope of § 1341 to tangible as distinguished from intangible property rights." *Id.* at 25, 108 S.Ct. at 320. It then reasoned that "[t]he Journal ... was defrauded of much more than its contractual right to [the columnist's] honest and faithful service, an interest too ethereal in itself to fall within the protection of the mail fraud statute." *Id.* The Court concluded that "[t]he Journal had a property right in keeping confidential" the information divulged by the columnist, and that the mail fraud statute was therefore applicable. *Id.* at 26, 108 S.Ct. at 320. In reaching this conclusion, the Court noted that "[c]onfidential business information has long been recognized as property" to which " 'the corporation has the exclusive right and benefit, and which a court of equity will protect through the injunctive

---

**1.** The government does not appeal the district court's holding that Martinez did not waive his right to challenge the intangible rights theory

underlying his original conviction, and we therefore need not consider this issue.

process or other appropriate remedy.'" *Id.* (quoting 3 W. Fletcher, Cyclopedia of Law of Private Corporations § 857.1, p. 260 (rev. ed. 1986)).

■ The *Carpenter* decision guides our analysis. We begin by noting the well-accepted proposition that licensees have a protected property interest and therefore cannot be deprived of a license absent due process of the law. *See Mackcy v. Montrym*, 443 U.S. 1, 10, 99 S.Ct. 2612, 2617, 61 L.Ed.2d 321 (1979) (driver's license); *Beauchamp v. De Abadia*, 779 F.2d 773, 775 (1st Cir.1985) (medical license); *Keney v. Derbyshire*, 718 F.2d 352, 354 (10th Cir.1983) (same); *Kudish v. Bradley*, 698 F.2d 59, 61 (1st Cir.1983) (same). Licenses have also been held to be property for the purposes of equitable distribution. *See, e.g., O'Brien v. O'Brien*, 66 N.Y.2d 576, 489 N.E.2d 712, 498 N.Y.S.2d 743 (1985) (medical license). These holdings are undoubtedly based on the fact that "[o]nce licenses are issued ... their continued possession may become essential in the pursuit of a livelihood." *Bell v. Burson*, 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed.2d 90 (1971).

In *Carpenter*, the Court found it significant that traditional property law recognizes the right of a corporation to enjoin the unauthorized use of confidential information. 484 U.S. at 26, 108 S.Ct. at 320. We have no doubt that the Commonwealth could enjoin the use of a medical license by one not entitled thereto or indeed could replevy the actual license to prohibit its further display. *See, e.g.,* Pa.Stat.Ann. 63 § 422.38 (Purdon 1989) (injunctions against unlawful practice); *id.* at § 422.41(2) (refusal, revocation or suspension for "practicing fraud or deceit ... in obtaining a license").

■ Martinez argues that there was no loss of money or property by the state. This argument depends on the questionable statutory construction that someone who fraudulently acquires property that has great value once acquired, has not violated the mail fraud statute if the item acquired had no, or negligible, value in the hands of the victim. Nothing in the statutory language supports that theory. The statute, which proscribes "obtaining money or property," is broad enough to cover a scheme to defraud a victim of something that takes on value only in the hands of the acquirer as well as a scheme to defraud a victim of property valuable to the victim but valueless to the acquirer.

■ Martinez points to the language in *McNally* that "the original impetus behind the mail fraud statute was to protect the people from schemes to deprive them of their money or property." 483 U.S. at 356, 107 S.Ct. at 2879. Arguably, taken out of context, this could signify that the statute applies only when the victim has been deprived of a valuable property right. However, the Court was clearly not focusing on the technical argument made here by Martinez but only on the issue presented in that case—whether property includes the ethereal right to honest government.

Indeed, in *Carpenter*, the release to defendants of the Wall Street Journal's confidential information of the schedule and contents of the columns "did not interfere with the Journal's use of the information ... and [did not] deprive the Journal of the first public use of it." *Carpenter*, 484 U.S. at 26, 108 S.Ct. at 320. Despite this lack of a tangible deprivation, the Court held the mail fraud act encompassed the scheme, saying "it is sufficient that the Journal has been deprived of its right to exclusive use of the information." *Id.*

Even if we construe the statute as requiring the deprivation of property from the victim, we find unpersuasive the theory Martinez espouses that a medical license is without value to the state before it is issued, obtaining property status only when it is in the hands of the licensee. We see nothing in the Supreme Court's jurisprudence on the mail fraud statute that requires or supports this theory of incipient or embryonic property.

Martinez cites to cases dealing with other types of licenses as authority for the proposition that a government license is not property in the hands of the government for purposes of a mail fraud conviction.

For example, in *United States v. Murphy*, 836 F.2d 248 (6th Cir.), *cert. denied*, 488 U.S. 924, 109 S.Ct. 307, 102 L.Ed.2d 325 (1988), the defendant was convicted under the mail fraud statute for providing false information to the state that an inactive Masonic Lodge was a viable tax-exempt organization entitled to a Certificate of Registration to conduct bingo games. Martinez points to the court's statement that the "bingo license may well be 'property' once issued, insofar as the charitable organization is concerned, but certainly an unissued certificate of registration is not property of the State of Tennessee and once issued, it is not the property of the State of Tennessee." *Id.* at 254. The court concluded that "Tennessee's right to accurate information with respect to its issuance of bingo permits constitutes an intangible right" and therefore does not fall within the protection of the mail fraud act. *Id.* at 254. Although the court made a passing reference to *Carpenter* in a footnote, *see, id.* at 253 n. 7, it failed to analyze the effect of *Carpenter's* holding that intangible rights can be protected under the mail fraud statute.

In *United States v. Dadanian*, 856 F.2d 1391 (9th Cir.1988), the court held, in a one-paragraph discussion, that defendants' fraudulent scheme to obtain a gambling license from a city did not satisfy the property requirement of *McNally*. The court acknowledged *Carpenter* with a *"cf."* reference without explanation. In *United States v. Kato*, 878 F.2d 267 (9th Cir.1989), a divided panel, relying on *Murphy* and *Dadanian*, concluded that the right conveyed by private pilot licenses issued by the Federal Aviation Administration as a result of defendant's fraudulent scheme did not constitute property under *McNally*. Again, *Carpenter* was referred to but not analyzed.[2]

The district courts that have considered whether schemes to defraud the government of licenses or similar entitlements constitute mail fraud have reached varying results. *Compare United States v. Granberry*, 725 F.Supp. 446 (E.D.Mo.1989) (state and school district have no property interest in bus driver permits); *United States v. Slay*, 717 F.Supp. 689 (E.D.Mo.1989) (city has no property interest in cable television franchise); *United States v. Ferrara*, 701 F.Supp. 39 (E.D.N.Y.) (state has no property interest in medical license), *aff'd without opinion*, 868 F.2d 1268 (1988), *with United States v. Berg*, 710 F.Supp. 438 (E.D.N.Y.1989) (federal government has property right in arms export licenses); *United States v. Turoff*, 701 F.Supp. 981 (E.D.N.Y.1988) (city has property interest in taxi medallions).

We see no reason to make the esoteric distinction between an unissued and issued license which underlies the *Murphy, Kato* and *Dadanian* opinions. *See Berg*, 710 F.Supp. at 444 ("preposterous" to hold that "valuable property vanishes when held in the hands of the issuer"). *McNally* only requires that the "[g]overnment's interests as property holder" be implicated in order for a scheme to fall within the mail fraud statute. *McNally*, 483 U.S. at 359 n. 8, 107 S.Ct. at 2881 n. 8. As noted in the seminal article by Professor Reich, a license is essentially one manifestation of the government "largess" of the modern state which "is originally public property, comes from the state, and may be withheld completely." Reich, *The New Property*, 73 Yale L.J. 733, 778 (1964); *see also Turoff*, 701 F.Supp. at 990.

In *Carpenter*, the Journal did not lose any "thing"—what it lost was the intangible right to keep to itself its information and the exclusive right to use it when and how it pleased. Similarly, in this case, what the Commonwealth (and derivatively its people) lost was the right to keep its medical licenses to itself and to bestow them on persons who had fairly earned them. The deprivations, although different

---

**2.** The dissent in *Kato* argued that the paper on which the licenses were issued is property within the meaning of the mail fraud act. *Kato*, 878 F.2d at 271. In the instant case, the indictment gave no notice that the mail fraud charge was predicated on the theory that the Commonwealth was deprived of the paper on which the license was printed. We therefore need not consider the adequacy of such a theory.

in character, are in each instance "of something of value," *see Carpenter*, 484 U.S. at 27, 108 S.Ct. at 321 (quoting *McNally*, 483 U.S. at 358, 107 S.Ct. at 2880).[3]

Finally, we note that in 1988, Congress amended the mail fraud act to provide that "the term 'scheme or artifice to defraud' includes a scheme or artifice to defraud another of the intangible right of honest services." Pub.L. No. 100–690, § 7603, 102 Stat. 4508 (1988) (codified as amended at 18 U.S.C. § 1346 (1988)). This amendment was enacted to "restore[] the mail fraud provision to where that provision was before the McNally decision." 134 Cong.Rec. H11,251 (daily ed. Oct. 21, 1988) (remarks of Representative Conyers). Although not determinative of the issue before us, it is relevant in that Congress made clear that the mail fraud statute was meant to be viewed broadly. We accord this view significant weight given the "sparse legislative history" underlying the act. *McNally*, 483 U.S. at 356, 107 S.Ct. at 2879.

In summary, the government's interest here is not simply that of a regulator, but rather that of the dispenser of valuable property in which the licensee has constitutionally protected property interests and which the government may enjoin upon misuse. We do not believe that Congress, in enacting the mail fraud statute, intended its reach to be dependent on artificial constructs and fleeting distinctions. Rather, the statute should be read as broadly protecting property interests, and we believe such a purpose is served in protecting the Commonwealth's interests

as the holder of valuable medical licenses from fraudulent conduct depriving it of such property.[4]

### IV.

#### *The Jury Charge*

Martinez also contends that even if we were to hold that a medical license is property in the hands of the state, his original conviction should be overturned because he was tried, indicted and convicted solely on an "intangible rights" theory.

The jury charge included the intangible rights theory. The court stated:

The object of the scheme need not be money or any form of tangible property. A scheme to defraud the citizens of a governmental unit or deprive public officials of information material to a decision which they are required to make in their official capacity also comes within the meaning of scheme or artifice to defraud as used in the mail fraud statute.

App. at 49–50.

Assuming *arguendo* that this portion of the charge was impermissible under *McNally*, we have repeatedly held that the mere presence of intangible rights theory language in an indictment or jury charge does not in and of itself require the overturning of a previous conviction. Rather, the decisive factor in these circumstances is whether "the scheme or artifice had the inevitable result of effecting monetary or property losses to the employer or to the state." *United States v. Asher*, 854 F.2d 1483, 1494 (3d Cir.1988), *cert. denied*, ——

3. This case is thus unlike that decided in *United States v. Evans*, 844 F.2d 36 (2d Cir.1988), where the court held that the right of the United States to prevent the resale of U.S. made arms from one foreign nation to another "is not 'money or property' under *McNally*." *Id.* at 40. In *Evans*, all that was at issue was the "right" "to control future alienation of armaments." *Id.* at 38. The court noted that right "has not been treated as a property right in other contexts." *Id.* at 41. As noted in the text *supra*, a medical license has been.

4. In light of our conclusion, we need not consider whether evidence that Murach received a tangible benefit by use of the fraudulent medical degree to obtain a residency at a Pennsylvania hospital satisfies the property element of the

crime of mail fraud. *See United States v. Allard*, 864 F.2d 248 (1st Cir.1989) (information alleging a scheme by the defendant to fraudulently obtain a license from the Commonwealth of Massachusetts sufficient under the mail fraud act because it linked defendant's fraud in obtaining the medical license with his fraud in obtaining the internship at the Worcester City Hospital). Nor do we decide whether this theory was sufficiently pled in the indictment to apprise the defendant " 'of what he must be prepared to meet.' " *United States v. Rankin*, 870 F.2d 109, 112 (3d Cir.1989) (quoting *Russell v. United States*, 369 U.S. 749, 763, 82 S.Ct. 1038, 1046, 8 L.Ed.2d 240 (1962)), *cert. denied*, —— U.S. ——, 110 S.Ct. 126, 107 L.Ed.2d 86 (1989).

U.S. ——, 109 S.Ct. 836, 102 L.Ed.2d 969 (1989). Hence, in *Asher* we upheld a mail fraud conviction, despite an intangible rights theory jury charge, because we were "unable to hypothesize a set of circumstances under which this jury could have found Asher guilty of depriving the citizens of the Commonwealth of their right to honest government ... without also having found that Asher was involved in a scheme" to deprive the Commonwealth of money. *Id.* at 1495.

Similarly, we sustained a conviction in *United States v. Piccolo*, 835 F.2d 517 (3d Cir.1987), *cert. denied*, 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 602 (1988), holding that because the jury was charged that it could convict the defendant based on an intangible rights theory and a finding that the victim suffered property losses, the jury necessarily found that an object of the scheme was to obtain property from the victim when it found the defendant guilty. In *United States v. Osser*, 864 F.2d 1056, 1063 (3d Cir.1988), we sustained the conviction, despite an intangible rights theory charge, because "[o]nce having found that Osser had participated in the bid rigging, the jury could not escape finding financial loss as part of the scheme." *See also United States v. Stoneman*, 870 F.2d 102, 104 (3d Cir.) (denying writ of error *coram nobis* because "loss of money was implicit in the intangible rights scheme"), *cert. denied*, —— U.S. ——, 110 S.Ct. 236, 107 L.Ed.2d 187 (1989).

Martinez argues this case is governed by *United States v. Zauber*, 857 F.2d 137 (3d Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1340, 103 L.Ed.2d 810 (1989). There, we considered and overturned a conviction on direct appeal where the indictment and charge focused solely on the deprivation of the employee's honest services resulting from his participation in a kickback scheme. The jury was not instructed to consider whether the kickbacks resulted in a monetary loss to the victimized pension fund, there was no evidence of property loss to the fund, and the jury was instructed that "it is absolutely irrelevant whether or not there was any loss in pension benefits, as well as whether or not the pension fund is presently financially strong." *Id.* at 145.

In this case, the only fraud charged in the indictment related to the scheme of Martinez and Murach to fraudulently obtain the license to practice medicine from the Commonwealth, and this charge was clearly supported by the evidence introduced at trial. Because we have already determined that the property interests of the Commonwealth were, of necessity, implicated by the fraudulent licensing scheme, the scheme "had the inevitable result of effecting" a property loss to the Commonwealth. *Asher*, 854 F.2d at 1494. It follows that the misstatement of the law included in the charge is insufficient to void Martinez' conviction of mail fraud.

## V.

### Conclusion

For the foregoing reasons, we will reverse the order of the district court granting Martinez' writ for error *coram nobis*.