

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-12-1994

# United States of America v. Henry

Precedential or Non-Precedential:

Docket 93-7267

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

## Recommended Citation

"United States of America v. Henry" (1994). *1994 Decisions.* Paper 80.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/80

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 93-7267


UNITED STATES OF AMERICA,
                          Appellant

V.

THOMAS HENRY;  MOWRY MIKE


ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(D.C. Criminal No. 92-00308)


Argued December 7, 1993

Before:  BECKER and NYGAARD, <u>Circuit Judges</u> and
WEIS, <u>Senior Circuit Judge</u>

(Opinion Filed   July 12, l994 )

WAYNE P. SAMUELSON, ESQUIRE
United States Attorney
MARTIN C. CARLSON, ESQUIRE (Argued)
Assistant United States Attorney
Federal Building
228 Walnut Street
P.O. Box 11754
Harrisburg, PA 17108
Attorneys for Appellant

PAUL J. KILLION, ESQUIRE
Killion & Metz
214 Pine Street
P.O. Box 11670
Harrisburg, PA 17101
Attorney for Appellee Thomas Henry

JAMES J. ROSS, ESQUIRE (Argued)
Bowers & Ross
820 Kennedy Drive
P.O. Box 280
Ambridge, PA 15003
Attorney for Appellee Mowry Mike

OPINION OF THE COURT

NYGAARD, Circuit Judge.

The government appeals the district court's dismissal of a twenty-one count indictment charging Thomas Henry and Mowry Mike with conspiracy, bank fraud, and wire fraud in connection with an alleged bid-rigging scheme. For the following reasons, we will affirm the dismissal of the indictment.

I.

Between 1986 and 1988, Thomas Henry was the Comptroller of the Delaware River Joint Toll Bridge Commission (the "Commission"). The Commission, a bi-state agency, operates and maintains twenty-one bridges spanning the Delaware River between New Jersey and Pennsylvania. Among these bridges are seven toll bridges that generate more than ten million dollars in revenue annually.

The Commission is governed by ten Commissioners, five of whom are appointed by the Governor of New Jersey and confirmed by the New Jersey Senate and five of whom represent Pennsylvania's Governor, Treasurer, Auditor General and Transportation Secretary. Mowry Mike, Pennsylvania's Executive Deputy Auditor General, served as Auditor General Donald Bailey's representative on the Commission between 1986 and 1988. Mike also was a political operative and campaign fund-raiser for Bailey during his unsuccessful runs in 1986 for the Democratic nomination for

the United States Senate and in 1988 for re-election as Auditor General.

The charges in the indictment were based on Henry's and Mike's alleged corruption of the process by which banks were chosen to be the depositories of the Commission's toll bridge revenues. The Commission invested the money in short-term certificates of deposit at banks selected through competitive bidding. As the Commission's Comptroller, Henry was responsible for this process and, according to the indictment, had "a fiduciary obligation to deal with Commission funds and other public money in a forthright and honest fashion." He would notify interested banks that the Commission had money it wished to deposit and that they could submit confidential bids to him in writing or by telephone by a certain deadline. After the deadline passed, the funds would be deposited with the bank meeting the Commission's financial requirements that offered the highest interest rate on the certificates of deposit.

According to the indictment, on ten occasions Henry disclosed bid information to Mike and another individual in the Auditor General's office, who in turn disclosed it to a representative of one bank, Bank A. Bank A was thus allegedly able to narrowly outbid the other banks by offering a slightly higher rate of interest and, as a result, received deposits of $34,278,000 in Commission funds. In return, representatives of Bank A allegedly afforded Mike expedited handling on a $50,000 car loan and contributed more than $10,000 to various political

campaigns, including Auditor General Bailey's Senate campaign, in which Mike was involved.

Count one of the indictment charged Henry and Mike with conspiracy to violate the federal mail, wire and bank fraud statutes, in violation of 18 U.S.C. § 371. Counts two through twenty-one charged ten counts of bank fraud in violation of 18 U.S.C. § 1344, and ten counts of wire fraud in violation of 18 U.S.C. § 1343, for each occasion on which the bidding information allegedly was compromised.[1] The indictment asserted that in rigging the bids, "Henry violate[d] his fiduciary duty and Commission custom, practices and policies" and "Henry, Mike and their [unindicted] co-conspirators defrauded the other banks bidding for these public funds of money and property, in that [they] denied these other bidding banks a fair and honest opportunity to receive this public money" or "a fair and honest opportunity to bid on" it.

The district court dismissed all of these counts, finding that the scheme alleged in the indictment, although unethical, did not involve a deprivation of property as required by McNally v. United States, 483 U.S. 350, 107 S. Ct. 2875 (1987), and therefore could not constitute mail, wire or bank fraud. The district court had jurisdiction under 18 U.S.C. §3231, and we have jurisdiction under 28 U.S.C. § 1291 and 18

_____

[1] The indictment also contained a twenty-second count charging Mike alone with obstructing justice during the investigation into the scheme, but this count was dismissed without prejudice pending this appeal.

4

U.S.C. § 3731. Our review of the district court's dismissal of the indictment on the grounds of legal insufficiency is plenary.

II.

In McNally v. United States, 483 U.S. 350, 107 S. Ct. 2875 (1987), the Supreme Court held that the federal mail fraud statute did not prohibit a scheme to defraud a state and its citizens of the intangible right to honest government, but rather only proscribed schemes to defraud their victims of money or property. Shortly thereafter, in Carpenter v. United States, 484 U.S. 19, 25, 108 S. Ct. 316, 320 (1987), the Court indicated that the mail and wire fraud statutes likewise do not reach schemes to defraud an employer of its intangible right to its employee's honest services. Carpenter made clear, however, that although a property right is required under McNally, it need not be a tangible one. The statutes cover schemes to defraud another of intangible property, such as confidential business information. Id. at 25-26, 108 S. Ct. at 320-21.

In response to McNally, Congress extended the fraud statutes' sweep to schemes to defraud the intangible right of honest services, see 18 U.S.C. § 1364, but that extension does not apply to this case. It did not become effective until November 18, 1988, well after the bid-rigging alleged in the indictment ceased, and it is not retroactive. See Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1417 n.4 (3d Cir.), cert. denied, 501 U.S. 1222, 111 S. Ct. 2839 (1991). Therefore, to state an offense under the federal fraud statutes, the indictment

5

against Henry and Mike must allege a scheme that meets McNally's standards.[2]

Initially, we see an intangible rights problem with the indictment's allegations involving Henry's derelictions of his duties to the public and the Commission.  Under McNally and Carpenter, a government official's breach of his or her obligations to the public or an employee's breach of his or her obligations to an employer cannot violate the fraud statutes. See Carpenter, 484 U.S. at 25, 108 S. Ct. at 320; McNally, 483 U.S. at 355, 107 S. Ct. at 2879.  These theories, however, were not the only ones relied upon in the indictment.  Indeed, the indictment's focus was not on the Commission or the public, but on the competing banks: its fraud claims were grounded on the allegation that Henry's and Mike's scheme defrauded these banks of a fair opportunity to bid to receive the Commission's funds.[3] The government now argues that Henry's and Mike's scheme also defrauded the Commission of its confidential business information

_____

[2]McNally and Carpenter involved the mail and wire fraud statutes, but their principles apply equally to the bank fraud statute because the operative language of all three is the same. See 18 U.S.C. §§ 1341, 1343, 1344.

[3]The focus on the competing banks as the scheme's victims is obviously necessary in the bank fraud counts, see United States v. Goldblatt, 813 F.2d 619, 623-24 (3d Cir. 1987) (noting that 18 U.S.C. § 1344 is aimed at losses to banks), and it is understandable in the other counts because of the unusual nature of this particular scheme.  Bid-rigging by public officials typically results in a government entity paying more than it otherwise would have for goods or services, see, e.g., United States v. Osser, 864 F.2d 1056, 1062-63 (3d Cir. 1988), United States v. Asher, 854 F.2d 1483, 1495-96 (3d Cir. 1988), cert. denied, 488 U.S. 1029, 109 S. Ct. 836 (1989), but the Commission allegedly made money here, receiving a higher interest rate on its deposits as a result of the scheme.

6

and the right to control how its money was invested, but these theories were not advanced in the indictment and cannot save it on appeal.[4]  See United States v. Zauber, 857 F.2d 137, 143 (3d Cir. 1988), cert. denied, 489 U.S. 1066, 109 S. Ct. 1340 (1989). The question, then, is whether a fair bidding opportunity is a property right of the competing banks.  If it is, the presence of any intangible rights allegations will not invalidate the indictment.  See United States v. Asher, 854 F.2d 1483, 1494 (3d Cir. 1988), cert. denied, 488 U.S. 1029, 109 S. Ct. 836 (1989).

We note that once the Commission's deposits actually were awarded to one of the bidding banks, they legally would be considered the property of that bank.  It is a fundamental principle of banking law that money deposited with a bank becomes the bank's property, and the bank may use it as its own.  In re Erie Forge & Steel Corp., 456 F.2d 801, 804 (3d Cir. 1972) (citing Prudential Trust Company's Assignment, 223 Pa. 409, 413, 72 A. 798, 799 (1909)); Lebanon Iron Co. v. Donnelly & Co., 29 F.2d 411, 412 (E.D. Pa. 1928).  Here, however, the money had not yet been deposited, and there is no way of knowing to which, if any, of the bidding banks it would have gone.  Even in a fair process, Bank A might still have won the deposits.  The issue,

---

[4]Because the loss of control theory was not alleged, we need not decide whether such a deprivation satisfies McNally. See United States v. Zauber, 857 F.2d 137, 147 (3d Cir. 1988) (questioning whether McNally supports the argument that the right to control money constitutes property), cert. denied, 489 U.S. 1066, 109 S. Ct. 1340 (1989).  But see United States v. Martinez, 905 F.2d 709, 714-15 (3d Cir.) (holding that state's "right to keep its medical licenses to itself and to bestow them on persons who had fairly earned them" is property), cert. denied, 498 U.S. 1017, 111 S. Ct. 591 (1990).

therefore, is whether the competing banks' interest in having a fair opportunity to bid for something that would become their property if and when it were received is in itself property. We conclude that it is not.

In holding that the Wall Street Journal was deprived of property in violation of the mail and wire fraud statutes when one of its reporters disclosed the timing and contents of his column before it was published, the Carpenter Court emphasized that the law had long treated confidential business information as "'a species of property to which the corporation has the exclusive right and benefit, and which a court of equity will protect through the injunctive process or other appropriate remedy.'" See Carpenter, 484 U.S. at 26, 108 S. Ct. at 320-21. Thus, to determine whether a particular interest is property for purposes of the fraud statutes, we look to whether the law traditionally has recognized and enforced it as a property right. See United States v. Evans, 844 F.2d 36, 41 (2d Cir. 1988) ("That the right at issue . . . has not been treated as a property right in other contexts and that there are many basic differences between it and common-law property are relevant considerations in determining whether the right is property under the federal fraud statutes.").

The competing banks' interest in a fair bidding opportunity does not meet this test. Clearly, each bidding bank's chance of receiving property -- the deposits if its bid were accepted -- was, at least in part, dependent on the condition that the bidding process would be fair. This

8

condition, which is all that the bidding banks allegedly lost, was thus valuable to them, but it is not a traditionally recognized, enforceable property right.  At most, the condition is a promise to the bidding banks from those in charge of the process that they would not interfere with it.  It is not a grant of a right of exclusion, which is an important aspect of traditional property.  See Carpenter, 484 U.S. at 26-27, 108 S. Ct. at 321.  Violation of this condition may have affected each bidding bank's possible future receipt of property, but that does not make the condition property.

The government bases its argument that the banks' interest in a fair bidding opportunity is property on a Seventh Circuit decision, United States v. Ashman, 979 F.2d 469 (7th Cir. 1992), cert. denied, ___ U.S. ___, 114 S. Ct. 62 (1993).  We believe, however, that Ashman does not support the government's contention.  In Ashman, a number of traders of commodities futures contracts at the Chicago Board of Trade ("CBOT") were convicted of mail and wire fraud, among other things, for manipulating trades.  The defendants were all either "locals" (who traded on their own accounts) or "brokers" (who executed orders from customers).  Trading at the CBOT took place in pits on the trading floor through "open outcry:" traders seeking to buy or sell, either for themselves or for customers, openly and audibly bid on or offered each contract so that all other traders in the pit could accept the bid or offer.  Id. at 475.  However, [i]n a "match" (the most recurrent type of fraud charged in the indictment), a broker traded buy and sell orders in equal quantities with a cooperating local. The two traders simply agreed on the price of the trade rather than bidding or offering the customer order in the open market and securing the best price available.  The broker thereby filled the customers' orders by selection and not on the market.

Id. at 477.  Most of the matches involved "market on close" orders directing the broker to execute just before the close of trading at the best possible price.  Id. at 476-77.  The defendants filled these orders after the day's legitimate trading had ended at a selected price within that day's closing range (the span between the highest and lowest prices actually traded in the market during the period immediately before the close of trading).  Id.  These matches resulted in profits for the local:

9

The broker sold a customer's sell order to the local at a lower price than the price at which he bought a different customer's buy order from the same local. The local thereby would buy low and sell high with the customer orders from the broker, guaranteeing that the local made money.

Id. at 477.

The defendants mounted a McNally challenge, arguing that matching trades did not involve the deprivation of property since the customers received just what they asked for when their orders were filled at a price within the closing range. Id. at 477. The Seventh Circuit disagreed insofar as matching denied the customers the opportunity to obtain a better price, but concluded that where the customers had no such opportunity, matching did not violate the fraud statutes. Id. at 477-79. The court thus invalidated the convictions for matching trades on "limit days" when the commodity's price was fixed and no other price was being traded in the pit, because "[m]erely denying a customer the opportunity to obtain the limit price by open outcry rather than by arranged trades [is] the kind of intangible deprivation that McNally held could not constitute mail fraud." Id. The government attempted to save the limit day convictions by arguing that the matching deprived other traders in the pits of the opportunity to profit on the trades, but the court rejected this claim as nothing more than the untenable "assertion that open outcry trading by itself constitutes a property right protected under the mail and wire fraud statutes[.]" Id. We see no difference between the other traders' interest in open outcry trading, which the Seventh Circuit held not to be property

in Ashman, and the competing banks' interest in a fair bidding process, which we hold not to be property here. Thus, Ashman supports our conclusion, not the government's position.

Our determination that the fair opportunity to bid is not a property right of the competing banks seals the fate of this indictment. It is irrelevant that, as the government points out, the scheme allegedly afforded its participants tangible benefits -- over $34,000,000 in deposits for Bank A, and favorable loan treatment and campaign contributions to his political allies for Mike. The same was true in McNally, but did not save the convictions there. McNally involved a self-dealing patronage scheme in which the Kentucky Democratic Party Chairman, a cabinet official, and a private individual arranged with the company securing the Commonwealth's workers compensation insurance that, in exchange for a continuing relationship, it would share the commissions it received from insurers with companies the defendants controlled. McNally, 483 U.S. at 352-53, 107 S. Ct. at 2877-78. In reversing mail fraud convictions obtained under the theory that the scheme defrauded Kentucky's citizens and government of the intangible right to have the Commonwealth's affairs conducted honestly, the Supreme Court stated:

> there was no charge and the jury was not required to find that the Commonwealth itself was defrauded of any money or property. It was not alleged that in the absence of the alleged scheme the Commonwealth would have paid a lower premium or secured better insurance. [The defendants] received part of the commissions but those commissions were not the Commonwealth's money. . . .

11

Id. at 360, 107 S. Ct. at 2882 (emphasis added). Just as the insurance commissions in McNally were not from the Commonwealth, the benefits Bank A and Mike received were not from the competing banks, and therefore those benefits cannot save the indictment here.

III.

In sum, we conclude that the indictment against Henry and Mike does not allege a scheme to defraud its victims of a property right and therefore does not state offenses under the federal fraud statutes. We therefore will affirm the district court's dismissal of the indictment.[5]

USA v. Henry    93-7267

WEIS, Circuit Judge, dissenting.

The case before us is not based on an "ethereal" right, but rather presents a far more substantial property right -- the ability of the other bidding banks to profit from a fund of more than $34 million, a not insignificant amount even in these days. That conclusion is not contrary to McNally v. United States, 483 U.S. 350 (1987), a case that was quite narrow in its actual holding. The Court concluded that although property rights are

---

[5]In light of our disposition of the government's appeal, we dismiss Mike's cross-appeal from the district court's denial of his motions for discovery and suppression as moot.

12

"clearly" within the protection of the mail fraud statute, "the intangible right of the citizenry to good government" is not. Id. at 356. That the Court had not intended to drastically narrow the scope of the statute became evident in Carpenter v. United States, 484 U.S. 19 (1987), a case decided in the following Term.

In Carpenter, the Court decided that confidential business information is a property right and that a scheme to disclose such information was within the proscription of the mail and wire fraud statutes even though the owner sustained no monetary loss. Id. at 25. In categorizing confidential business information, the Court explained: "[I]ts intangible nature does not make it any less `property' . . . . McNally did not limit the scope of § 1341 to tangible as distinguished from intangible property rights." Id. Reiterating the broad scope of the statute, the Court commented: "As we observed last Term in McNally, the words `to defraud' in the mail fraud statute have the `common understanding' of `wronging one in his property rights by dishonest methods or schemes, and usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.'" Id. at 27 (quoting McNally, 483 U.S. at 358 (internal quotations omitted)).

In a post-McNally case, United States v. Asher, 854 F.2d 1483, 1494 (3d Cir. 1988), we concluded that the test for determining whether a deprivation is cognizable under the mail fraud statute is:

> "[W]here rights are involved whose violation
> would lead to no concrete economic harm, and

13

where those rights are the only rights involved in the case, McNally's proscriptions would prevent upholding conviction on appeal. Where, on the other hand, a violation of the rights involved would result in depriving another of something of value, and the indictment . . . [is] based on that fact, then the presence of intangible rights language will not prove fatal . . . ."

See also United States v. Piccolo, 835 F.2d 517 (3d Cir. 1987).

We returned to the property concept in United States v. Martinez, 905 F.2d 709 (3d Cir. 1990), where the defendant had been convicted of fraudulently obtaining a medical license from the state by the use of forged school transcripts. The defendant argued that an unissued license was not property under McNally's reasoning and was without value to the state. Id. at 713. We rejected this argument, finding "nothing in the Supreme Court's jurisprudence on the mail fraud statute that requires or supports this theory of incipient or embryonic property." Id. In declining to follow decisions in other circuits that distinguished between issued and unissued licenses, we concluded that Congress had not intended the reach of the mail fraud statute "to be dependent on artificial constructs and fleeting distinctions." Id. at 715. Rather, we read the statute as "broadly protecting property interests." Id.

The deprivation of property rights in conjunction with the federal fraud statutes has been addressed in the bid-rigging

14

context.  For example, in Ranke v. United States, 873 F.2d 1033, 1039-40 (7th Cir. 1989), the Court upheld a conviction even though the purchaser of services actually suffered no loss because the successful bidder absorbed the bribes for confidential information out of its own profits.  See also Belt v. United States, 868 F.2d 1208, 1214 (11th Cir. 1989) (confidential bidding information as a result of bribery was a violation of the wire fraud statute).  The thrust of these cases, however, was on the loss of property by persons soliciting bids rather than those submitting the bids.

The indictment here focuses on the loss of property by the competing bidders and not by the Commission.  The indictment charges that defendants executed "a scheme and artifice to defraud federal chartered and insured financial institutions of money and property by depriving these financial institutions of a fair and honest opportunity to bid on public money . . . ."[6]  No loss, either of pecuniary interest or of confidential information, on the part of the Commission is mentioned in the indictment, and thus, a Carpenter-type fraud is not asserted.

The indictment is somewhat unartfully worded in asserting that the other banks were denied the opportunity to bid.  As a recitation of the facts in the indictment makes clear,

---

[6]Although the majority notes that the Commission allegedly made money because it received a higher interest rate on this deposit as a result of the fraud, it is possible that without the confidential information and the necessity for making political campaign contributions in return, Bank A would have made higher bids.  The situation, therefore, is the same as in Ranke where the successful low bidder absorbed the costs of the bribes in its price.

15

however, the loss incurred by the competing bidders was actually the opportunity to have a legitimate bid accepted, not merely submitted.  See Ginsburg v. United States, 909 F.2d 982, 984 (7th Cir. 1990) (court is to look at specific conduct alleged and not at the legal characterization of facts set forth in the indictment).

Unlike the majority, I believe that the unsuccessful banks had a sufficient property interest in a legitimate bidding process to support the fraud charges here.  The wire fraud statute is not to be given a narrow construction, but is instead to be interpreted to guard the public (including banks) against the many fraudulent schemes that the fertile minds of the criminally inclined may devise.

Transferring property concepts from one area of the law to another must be done cautiously with an appreciation of the differing circumstances and aims of the law that are implicated.  With due recognition of the limitations that must be placed on transpositions of this nature, however, it seems to me that the tort of interference with prospective contractual relationships is a legitimate reference point.

The conduct of defendants as detailed in the indictment was palpably dishonest and was specifically intended to deprive the other banks of profitable contracts with the Commission.  The competing bank submitting the highest legitimate bid had an enforceable proprietary interest that was harmed.  This is demonstrated by the fact that the unsuccessful bidder would have had a civil remedy against these defendants and Bank A for the

16

tortious interference with prospective contractual relationships.

Restatement (Second) of Torts § 766B provides that one who intentionally and improperly interferes with another's prospective contractual relations is subject to liability for any resultant pecuniary harm if the improper conduct caused a third person not to enter into an agreement.  See Leonard Duckworth, Inc. v. Michael L. Field & Co., 516 F.2d 952, 955 (5th Cir. 1975) ("[T]he common law has long held that the reasonable expectancy of a prospective contract is a property right to be protected from wrongful interference in the same sense as an existing contract is protected."); see also Small v. United States, 333 F.2d 702, 704 (3d Cir. 1964); Dupree v. United States, 264 F.2d 140, 143 (3d Cir. 1959).

The same philosophy was expressed in a different context, almost a century ago.  "[T]he notion is intolerable that a man should be protected by the law in the enjoyment of property, once it is acquired, but left unprotected by the law in his efforts to acquire it.  The cup of Tantalus would be a fitting symbol for such a mockery." Brennan v. United Hatters of North America, Local No. 17, 65 A. 165, 171 (N.J. 1906).  For an even earlier holding, see Keeble v. Hickeringill, 103 Eng. Rep. 1127 (Q.B. 1707) (defendant's actions in frightening away ducks from plaintiff's pond supported a claim for damages even though plaintiff had never taken possession of the fowl).

In Bruce Lincoln–Mercury, Inc. v. Universal C.I.T. Credit Corp., 325 F.2d 2, 13 (3d Cir. 1963), we observed that the law extends its protection further in the case of interference

17

with existing contracts than in precontractual interference, but does draw a line beyond which no one may go in deliberately intermeddling with the business affairs of others. "The interest protected is [a] reasonable expectation of economic advantage." Id. (footnote omitted). See W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 130 (5th ed. 1984).

The victims' loss in this case is not theoretical like the deprivation of faithful government service excluded by McNally, but is instead concrete and measurable. The allegations in the indictment make it clear that in each instance the bank that submitted the highest legitimate bid would have received the Commission's money, but for the defendants' fraud. Thus, the indictment establishes an actual, not an illusory or speculative loss to that bank in each of the instances when defendants disclosed the confidential information.

The indictment in United States v. Castor, 558 F.2d 379 (7th Cir. 1977) charged the defendant with fraudulently obtaining a quite limited supply of liquor store permits to the detriment of those who were thus unable to obtain one. The Court concluded that the "diminished opportunity to obtain permits reduced the other applicants' chances to make profits through the operation of package liquor stores . . . [and was] a type of potential pecuniary injury . . . [previously recognized as] the diminished opportunity to obtain a financially favorable contract." Id. at 384; see also Johnson v. United States, 82 F.2d 500, 503 (6th Cir. 1936) (unsuccessful bidder in bid-rigging scheme was defrauded for purposes of mail fraud statute).

18

A somewhat similar set of circumstances supported a conviction in Gregory v. United States, 253 F.2d 104 (5th Cir. 1958). There, the defendant, through the fraudulent use of pre-dated postal cancellations, was able to send the actual results, rather than predictions, of football games as his entries in a contest that awarded a new automobile as a prize. The defendant argued that "so far as other contestants were concerned, until the bird was in the hand, the Cadillac did not belong to them either singularly or in a group." Id. at 109. The Court rejected that contention and pointed out that the defendant's conduct "was to cheat and deceive, to pretend and misrepresent. As such, it was to defraud . . . ." Id.

All three cases are pre-McNally, but nothing there or in Carpenter would weaken the reasoning or holdings in the three Courts of Appeals decisions.[7] The fraudulent deprivation of a reasonable expectation to secure an economic advantage falls within the proscriptions of the federal fraud statutes.

Unlike the majority, I am not persuaded that this case falls within the rationale of United States v. Ashman, 979 F.2d 469 (7th Cir. 1992). There were actually two holdings in that case. In the first, the Court of Appeals affirmed the convictions where the defendants removed their customers from the

---

[7]See Craig M. Bradley, Foreword: Mail Fraud After McNally and Carpenter: The Essence of Fraud, 79 J. Crim. L. & Criminology 573 (1988). "[T]he question of what is `property,' after the Court's seemingly inconsistent signals in McNally and Carpenter, answers itself: Property is . . . anything that can provide economic loss to the victim and gain to the defendant including information, reputation and anything else on which a dollar value can be placed." Id. at 597.

19

competitive market place, thus denying them the opportunity to obtain a better price.  Id. at 477-78.  Only where a price limit had been set and the customer could not benefit from bidding did the Court find that the "open outcry" system did not constitute a deprivation of money or property.  Id. at 479.  Significantly, it does not appear that the indictment in Ashman charged the defendants with interfering with the property interest of other brokers or anyone other than the customers.

Several statements in the Ashman opinion, however, tend to support my position here.  In reviewing its precedents, the Court of Appeals commented:  "In previous cases, we have held that shifting or altering of economic risk or opportunity to affect a person's financial position adversely deprives that person of money or property."  Id. at 478.  "[Our prior decisions] demonstrate that the deliberate deprivation of a clear financial opportunity violate[s] the mail fraud statute."  Id.

In my view, the activities of defendants in this case constituted a "deliberate deprivation of a clear financial opportunity" and are thus punishable under the wire and bank fraud statutes.  Accordingly, I would reverse the judgment of the district court and would uphold the indictment.

20