WARNER, J.
Appellant, Kathy Dent, appeals her conviction for engaging in an organized scheme to defraud, in violation of section 817.034(4), Florida Statutes. The state charged and proved that Dent and others manipulated the Sheriffs overtime assignment computer system to secure more hospital guard overtime assignments than the Sheriffs policy would allow. As a result, Dent worked those assignments, earning overtime pay, which shut out other Sheriffs deputies from the opportunity to earn overtime pay. We conclude that although what Dent did may have been contrary to Sheriffs policies and procedures, it is not a criminal violation. We thus reverse.
The Palm Beach County Sheriffs Office provides deputies for hospital duty to guard an inmate or arrested person who is admitted to a hospital. Initially, a deputy on the current shift is assigned to the hospital when the prisoner is admitted, and that deputy serves until the end of his or her shift, at which time it becomes an overtime assignment. To fill these assignments, the Sheriffs department utilizes a computer program which allows deputies to sign up to work overtime shifts. The lieutenant on the shift when the prisoner is admitted to the hospital creates a computer record of the prisoner’s admittance. It generates a weekly list of overtime shifts for the week for that prisoner, although if the prisoner is released from the hospital those overtime shifts would not be used. The positions for new overtime shifts become available for signup at midnight on Sunday night for the following week. To obtain the right to work one of these shifts, deputies must log into the system and sign up for one shift at a time. Once the deputy signs up for a shift he/she must wait 48 hours before signing up for another one. No one is allowed to sign up another person for an overtime shift except supervisors who are signing deputies to cover a present shift. Lieutenants can also sign up others for overtime shifts.
Complaints were raised because several deputies noticed that the defendant, Kathy Dent, was already assigned to work various overtime shifts when the shifts became available at midnight on Sunday night. An investigation revealed that Dent was assigned on the computer system to a hospital overtime shift 388 times. Dent’s friend, Lieutenant Sandra Nealy, assigned Dent to work 100 hospital overtime shifts during a one-year period. Although Dent did not work all the overtime shifts she was assigned, she earned more than $18,000 working hospital overtime shifts.
In the information, the state charged that Dent “did engage in a scheme constituting a systematic, ongoing course of conduct with intent to defraud one or more persons, or to obtain property from one or more persons by false or fraudulent, representations, or promises, and did obtain property from one or more of such persons ....” At trial, the state presented its theory that Dent’s manipulation of the computer overtime signup system prevented other Sheriff’s deputies from signing up for overtime, and that other deputies lost the opportunity to get these assignments and earn overtime pay. Dent earned over $18,000 in overtime pay for overtime shifts that she actually worked. This was not a case, however, where she was paid for shifts that she did not work. The jury convicted her of a third degree felony, prompting this appeal.
Dent claims that the state failed to prove that she obtained “property” within the meaning of the statute when all the state proved was the inability of other deputies to sign up for the opportunity to *207 obtain overtime. In other words, her conduct did not amount to a crime. We agree and reverse.
Section 817.034 is titled the “Florida Communications Fraud Act.” The Legislature specifically provided its intent in adopting this criminal statute:
(1) Legislative intent.—
(a) The Legislature recognizes that schemes to defraud have proliferated in the United States in recent years and that many operators of schemes to defraud use communications technology to solicit victims and thereby conceal their identities and overcome a victim’s normal resistance to sales pressure by delivering a personalized sales message.
(b) It is the intent of the Legislature to prevent the use of communications technology in furtherance of schemes to defraud by consolidating former statutes concerning schemes to defraud and organized fraud to permit prosecution of these crimes utilizing the legal precedent available under federal mail and wire fraud statutes.
The statute defines various terms, including “scheme to defraud,” “obtain,” and “property”:
(b) “Obtain” means temporarily or permanently to deprive any person of the right to property or a benefit therefrom, or to appropriate the property to one’s own use or to the use of any other person not entitled thereto.
(c) “Property” means anything of value, and includes:
1. Real property, including things growing on, affixed to, or found in land;
2. Tangible or intangible personal property, including rights, privileges, interests, and claims; and
3. Services.
(d)“Scheme to defraud” means a systematic, ongoing course of conduct with intent to defraud one or more persons, or with intent to obtain property from one or more persons by false or fraudulent pretenses, representations, or promises or willful misrepresentations of a future act.
Because the Legislature directs us to use the legal precedents under the similar federal statute, we look to those precedents and conclude that the opportunity to sign up for overtime, which was deprived to other deputies by Dent’s conduct, is not “property” within the meaning of the statute.
In United States v. Henry, 29 F.3d 112 (3d Cir.1994), two public officials were charged with bank fraud and wire fraud for corruption of the process by which banks were chosen as depositories for funds from various toll bridges. The commission in charge of the funds conducted a competitive- bidding process with various banks for their short-term deposits. The two public officials interfered with the process by notifying one bank of the bid information in advance, allowing that bank to outbid the other banks in the bidding process. In return, the public officials received campaign contributions and favorable treatment on loans from the bank.
The government asserted that what the other banks lost in this scheme was a fair opportunity to bid in the process. The court concluded, however, that this loss of opportunity was not “property” within the meaning of the bank and wire fraud statutes.
Here, however, the money had not yet been deposited, and there is no way of knowing to which, if any, of the bidding banks it would have gone. Even in a fair process, Bank A might still have won the deposits. The issue, therefore, is whether the competing banks’ interest *208 in having a fair opportunity to bid for something that would become then-property if and when it was received is in itself property. We conclude that it is not.
.... [T]o determine whether a particular interest is property for purposes of the fraud statutes, we look to whether the law traditionally has recognized and enforced it as a property right. See United States v. Evans, 844 F.2d 36, 41 (2d Cir.1988) (“That the right at issue ... has not been treated as a property right in other contexts and that there are many basic differences between it and common-law property are relevant considerations in determining whether the right is property under the federal fraud statutes.”).
The competing banks’ interest in a fair bidding opportunity does not meet this test. Clearly, each bidding bank’s chance of receiving property — the deposits if its bid were accepted — was, at least in part, dependent on the condition that the bidding process would be fair. This condition, which is all that the bidding banks allegedly lost, was thus valuable to them, but it is not a traditionally recognized, enforceable - property right. At most, the condition is a promise to the bidding banks from those in charge of the process that they would not interfere with it. It is not a grant of a right of exclusion, which is an important aspect of traditional property. See Carpenter [v. United States, 484 U.S. 19, 26-27, 108 S.Ct. 316, 321, 98 L.Ed.2d 275 (1987) ]. Violation of this condition may have affected each bidding bank’s possible future receipt of property, but that does not make the condition property.
29 F.3d at 114-15. The loss of an opportunity interest did not constitute “property” within the meaning of the wire and mail fraud statutes, whose interpretations are to govern the interpretation of section 817.034.
This reasoning was also applied in United States v. Alsugair, 256 F.Supp.2d 306 (D.N.J.2003), where the defendant was charged with wire fraud in a scheme to defraud English skills testing services by allowing imposters to take English tests for foreign students. The mail fraud statute, 18 U.S.C. § 1341, made it a crime to engage in a scheme to obtain money or property by false pretenses. The court examined what constituted a property right:
“[T]o determine whether a particular interest is property for purposes of the fraud statutes, we look to whether the law traditionally has recognized and enforced it as a property right.” United States v. Henry, 29 F.3d 112, 115 (3d Cir.1994). Two of the hallmarks of traditional property are exclusivity, see Henry, 29 F.3d at 115; Carpenter, 484 U.S. at 26-27, 108 S.Ct. 316, 98 L.Ed.2d 275; see also College Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 673, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999) (“The hallmark of a protected property interest is the right to exclude others.”), and transferability, see Boss Co., Inc. v. Bd. of Comm’rs of the City of Atlantic City, 40 N.J. 379, 385, 192 A.2d 584, 587 (1963) (“qualities of property” include monetary value and transferability).[6] The court should consider whether the right at issue has been treated as a property right in other contexts and whether the right has basic differences from common-law views of property. Henry, 29 F.3d at 115 (citing United States v. Evans, 844 F.2d 36, 41 (2d Cir.1988)).
*209 256 F.Supp.2d at 313.
In Alsugair, the court found that the defendant had deprived the victim, the testing service, of at least its goodwill in its testing application, and thus denied the motion to dismiss. Important to this case is the court’s reiteration of the hallmarks of property, namely exclusivity and transferability, neither of which are present in the lost opportunity of working overtime, which is what the state sought to prove in this case.
We have also determined that expectation interests do not constitute property under similar definitions of property in the theft statute. In Balcor Property Management, Inc. v. Ahronovitz, 634 So.2d 277 (Fla. 4th DCA 1994), we considered whether a party who allegedly conspired with one of a corporation’s shareholders to transfer the assets out of the corporation could be considered to have stolen property of the other shareholder of the corporation, with the “property” being the means of recovery for the shareholder’s claims against the corporation. We held that a party must show a legally recognized property interest to recover for civil theft:
[W]hat interest did appellee have in the property stolen and what legally recognizable injury has he suffered as a result of this theft? To maintain a cause of action under the civil theft statute one must have been injured by the defendant’s violation of one or more of the provisions of the criminal theft laws found in sections 812.012-037, Florida Statutes (1989). See § 772.11, Fla.Stat. (1989). This injury can only be established if it is shown that the victim has a legally recognized property interest in the items stolen.
[[Image here]]
The mere expectation that the equipment sold to Ciro’s could be used to satisfy a judgment that appellee would eventually obtain against the corporation represents a highly speculative harm to appellee at best. Furthermore, appellee confronts yet another insurmountable obstacle in proving his claim because such a vague, amorphous, and presently unrealized interest could hardly be considered “property” subject to theft within the meaning of the criminal theft statutes. Although property is defined in the statute as anything of value and includes “rights, privileges, interests and claims”, the “owner” must be capable of having “an interest in the property upon which another person is not privileged to infringe without consent”. §§ 812.012(3)(a) and 812.012(4), Fla.Stat. (1989). Appellee has shown neither a legally recognizable interest in the property nor quantifiable injury to himself and has presented no persuasive authority to support his position.
Id. at 279-80 (internal citation omitted and emphasis added).
Similarly, in this case, what the state alleged was lost was the opportunity for other deputies to work for overtime pay. This opportunity did not belong to any one of them. It simply does not fit the definition of property traditionally used in criminal prosecutions and specifically not used in similar federal statutes. See Henry.
While Dent’s manipulation of the signup system for overtime duty may have violated the policies of the department, and may be grounds for discipline or termination, she did not obtain “property” within the meaning of the statute. Therefore, no violation of section 817.034 occurred.
*210 We reverse and direct that Dent’s conviction and sentence be vacated.
STEVENSON, J., and STONE, BARRY J., Senior Judge, concur.

. In determining whether the law has traditionally recognized a property right, federal courts may look to state courts for guidance. See, e.g., Cleveland v. United States, 531 *209 U.S. 12, 23-24, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000) (analyzing state law to assess alleged property interest in gaming licenses); United States v. Antico, 275 F.3d 245, 262-64 (3d Cir.2001) (analyzing state law to determine scope of public employee's obligations in honest services fraud case).