

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-16-2004

# USA v. Al Hedaithy

Precedential or Non-Precedential: Precedential

Docket No. 03-1566

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"USA v. Al Hedaithy" (2004). *2004 Decisions.* Paper 16.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/16

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL


IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

NO. 03-1566

———————

UNITED STATES OF AMERICA

v.

HANY AL HEDAITHY,
Appellant

———————

On Appeal From the United States
District Court For the District of New Jersey
(D.C. Crim. Action No. 02-cr-00379)
District Judge:  Hon. Joseph E. Irenas

———————

NO. 03-1885

UNITED STATES OF AMERICA

v.

RIYADH AL-AIBAN
Appellant

On Appeal From the United States
District Court For the District of New Jersey
(D.C. Crim. Action No. 02-cr-00371-1)
District Judge:  Hon. Joseph A. Greenaway, Jr.

Argued June 29, 2004

BEFORE:  AMBRO, ALDISERT and
STAPLETON, Circuit Judges

(Opinion Filed:   December 16, 2004)

Donald C. Randolph (Argued)
Randolph & Associates
1717 4th Street - 3rd Floor
Santa Monica, CA  90401
 Attorney for Appellant
  Hany Al Hedaithy

Steven G. Sanders (Argued)
Arseneault, Fassett & Mariano
560 Main Street
Chatham, NJ  07928
  Attorney for Appellant
  Riyadh Al-Aiban

George S. Leone (Argued)
Office of the United States Attorney
970 Broad Street - Room 700
Newark, NJ  07102
  and
Glenn J. Moramarco
Office of the United States Attorney
Camden Federal Building & Courthouse
401 Market Street - 4th Floor
P.O. Box 2098
Camden, NJ  08101
  Attorneys for Appellee

STAPLETON, Circuit Judge:

Defendant Riyadh Al-Aiban appeals his conviction, following an unconditional guilty plea, of conspiracy to commit mail fraud in violation 18 U.S.C. §§ 371 and 1341. Defendant Hany Al Hedaithy appeals his conviction, following a bench trial on stipulated facts, for conspiracy to commit mail fraud in violation of 18 U.S.C. §§ 371 and 1341, and mail fraud in violation of 18 U.S.C. §§ 1341 and 2. Al-Aiban and Al Hedaithy (collectively, "Defendants") are two of approximately sixty foreign nationals of Arab and/or Middle Eastern descent who were charged in the United States District Court for the District of New Jersey for allegedly participating in a scheme by which imposters were paid to sit for the Test of English as a Foreign Language ("TOEFL"), a standardized test administered by the Educational Testing Service ("ETS"). The purpose of the scheme was allegedly to create the false appearance that Defendants, among others, had taken and achieved an acceptable score on the TOEFL exam so that they could remain eligible to live in the United States under a student visa.

Both Defendants challenge the sufficiency of their respective superseding indictments, arguing that the conduct alleged therein does not fall within the proscription of the mail fraud statute. Additionally, Al Hedaithy argues that the

evidence presented at his bench trial was not sufficient to support his conviction, and he also challenges the District Court's denial of his motion for discovery with respect to a claim that he was selectively prosecuted by the Government on account of his race or ethnicity. As a threshold matter, we must also decide whether Al-Aiban's guilty plea resulted in a waiver of his right to challenge the sufficiency of his superseding indictment. For the reasons that follow, we will affirm the convictions of each Defendant.

I.

"For purposes of determining the sufficiency of the superseding [indictments], we assume the truth of the following facts alleged in the superseding [indictments]." *United States v. Panarella*, 277 F.3d 678, 681 (3d Cir. 2002). ETS is in the business of designing and administering certain standardized tests. One of those tests, TOEFL, is commonly used by educational institutions in the United States when considering a student for admission to its academic program. Certain schools require foreign students, as a condition of admission, to achieve a minimum score on the TOEFL exam in order to demonstrate proficiency in the English language. Full-time enrollment at a federally approved school, college, or university is, in turn, a requirement for foreign nationals to obtain a student visa and thus reside legally in the United States.

According to the Government, ETS possesses, and attempts to maintain, goodwill that it has accumulated based upon the integrity of its TOEFL product. ETS has also endeavored to keep its TOEFL exam exclusive, secure, and confidential. It owns registered trademarks in the terms

5

"Educational Testing Service," "ETS," and "TOEFL." It uses these trademarks on its TOEFL examinations and the score reports that it generates for each applicant who takes TOEFL. ETS also owns copyrights in the TOEFL examination itself and in the questions used on each exam. Furthermore, the company restricts access to, and use of, its copyrighted TOEFL exam and questions, its trademarked score reports, and its test administration and scoring services.

When an applicant applies to take the TOEFL exam and pays the required fee, he is provided with an appointment number. The applicant must then appear at a designated test center, provide proof of identity, provide the appointment number, and sign a confidentiality statement. Pursuant to the confidentiality statement, the applicant promises to preserve the confidentiality of the examination. By signing the statement, the applicant also certifies that he is the same person whose name and address was used in completing the application. The applicant must then have his photograph taken in order to ensure that someone else did not take the exam for the applicant. The photograph subsequently appears on the applicant's score report. Applicants who do not comply with the conditions set by ETS are not permitted to sit for the exam.

Once the TOEFL exam is completed, the exam results are wired from the test center to a company in Baltimore, Maryland, which in turn transmits the results by wire to ETS for processing. ETS then mails each score report to the location designated by the applicant.

In 1999, the Government became aware of a scheme in which Defendants, both Saudi Arabian nationals, and numerous other foreign nationals of Arab and/or Middle Eastern descent, paid an imposter to take and pass the TOEFL exam for them.

The purpose of the scheme was to create the false appearance that Defendants themselves had taken and achieved an acceptable score on the TOEFL exam. In furtherance of this scheme, each Defendant applied to take the exam, and then paid money to an imposter to appear at the designated test center and falsely identify himself as the respective Defendant. The imposter then signed the confidentiality statement, had his photograph taken, sat for the TOEFL exam using the respective Defendant's name, and directed that his exam results be mailed to a California address under the control of one Mahmoud Firas. ETS then processed the exam, and the results were mailed to the pre-designated location in California. There, Firas or one of his associates substituted each Defendant's photograph in place of the imposter's photograph. This doctored score report was then sent to legitimate educational institutions in a phony envelope bearing ETS's trademark.

On May 9, 2002, a federal grand jury returned a one-count indictment charging Al-Aiban with conspiring to commit mail fraud in violation of 18 U.S.C. §§ 371 and 1341. That same day, Al Hedaithy was charged in a two-count indictment with conspiring to commit mail fraud in violation of 18 U.S.C. §§ 371 and 1341, and mail fraud in violation of 18 U.S.C. §§ 1341 and 2. Each indictment described the subject of the Defendant's alleged fraud as ETS's "property interest in maintaining the integrity of the testing process." Subsequently, a federal court dismissed a similarly-worded indictment, holding that the integrity of the testing process was not a property interest covered by the mail fraud statute. *See United States v. Alkaabi*, 223 F. Supp. 2d 583, 589-90 (D.N.J. 2002).

The Government thereafter filed superseding indictments against Al-Aiban and Al Hedaithy, in which it attempted to

7

describe ETS's property interest in greater detail. Al-Aiban was again charged with one-count of conspiring to commit mail fraud in violation of 18 U.S.C. §§ 371 and 1341, and Al Hedaithy was charged with two counts – conspiring to commit mail fraud in violation of 18 U.S.C. §§ 371 and 1341, and mail fraud in violation of 18 U.S.C. §§ 1341 and 2. Both superseding indictments were identical in their description of ETS's property interest:

> ETS had property interests in its TOEFL product, including (i) materials bearing its trademarks, such as the TOEFL exam and score report, (ii) its copyrighted materials, such as the TOEFL exam and its questions, (iii) the ETS-specified test administration and scoring services for the TOEFL exam, and (iv) the value of ETS's goodwill, which is an asset of ETS and is based in part on maintaining the integrity of the testing process.

Each superseding indictment further alleged that:

> As part of this conspiracy, the Conspirators defrauded ETS of the property described [above]. They did so by obtaining access to and use of ETS's trademarked materials, copyrighted materials, and services, by obtaining ETS's official score report, and by obtaining the benefit of, and undermining, ETS's goodwill and the value of its trademark and copyright.

8

Defendants' individual cases then proceeded along significantly different paths. Al-Aiban entered into a plea agreement with the Government, pursuant to which he agreed to enter a guilty plea and waive his right to appeal the conviction.[1] After accepting Al-Aiban's guilty plea, the District Court determined that the final adjusted offense-level was four, and sentenced him to pay a $2,500 fine. This conviction rendered him ineligible to remain in the United States, *see* 8 U.S.C. § 1227(a)(2)(A)(i), and ineligible to return to the United States for at least five years. 8 U.S.C. § 1182. Al-Aiban voluntarily departed the United States following his conviction. He has filed a timely notice of appeal.

Al Hedaithy, on the other hand, challenged both the superseding indictment and the conduct of the prosecution. He filed a motion to dismiss his superseding indictment pursuant to Fed. R. Crim. P 12(b)(2), claiming that it failed to allege conduct that violated the mail fraud statute. Al Hedaithy's motion also claimed that the Government's attempted expansion

---

[1]The relevant provision of Al-Aiban's plea agreement stated:
> Riyadh Al-Aiban knows that he has, and voluntarily waives, the right to file any appeal, any collateral attack, or any other writ or motion after sentencing, including but not limited to an appeal under 18 U.S.C. § 3742 or a motion under 28 U.S.C. § 2255, which challenges the sentencing court's determination or imposition of the offense level, if the total offense level determined by the court is equal to or less than four.

of the scope of the federal mail fraud statute in this case constituted a violation of his right to due process. The District Court denied the motion. The Court reasoned that the requirements of the mail fraud statute were satisfied because Al Hedaithy obtained from ETS a certificate that he had passed the TOEFL and ETS was thereby deprived of some value of its goodwill.

Thereafter, Al Hedaithy filed a motion requesting discovery in order to support a claim that he, and other defendants in related cases, were being selectively prosecuted as a result of their race or ethnicity. In support of this motion, he provided the District Court with several news articles indicating that thousands of people cheat on the TOEFL exam each year. He further submitted materials suggesting that prior to his case, the Government had never sought to prosecute exam takers for alleged cheating. Moreover, Al Hedaithy pointed out that all of the approximately sixty individuals charged for participating in the alleged scheme were persons from Arab and/or Middle Eastern countries. Finally, he presented evidence that the Government's expressed intent in these cases was to prosecute the participants as part of the war on terrorism.

The District Court held a hearing on Al Hedaithy's discovery motion, at which it assumed that discovery would show that Al Hedaithy was being prosecuted specifically because he was from an Arab and/or Middle Eastern country.[2]

--------

[2]The District Court stated:

> I find that[] [the sufficiency of the evidence to order discovery is] a very hard standard to articulate, even after reading the cases, exactly

10

The Court, however, held that such a motivation would not be unconstitutional under the equal protection component of the Fifth Amendment.

In conducting an equal protection analysis, the District Court first addressed the appropriate level of scrutiny that should be used. The Court noted that, because there has been no great history of discrimination in the United States against the Middle Eastern population, the level of scrutiny should be rational basis, "but at most would fall into the intermediate level of scrutiny." The Court therefore applied rational basis review, and concluded that a decision to target Middle Eastern and Arab people for prosecution survived such scrutiny. In reaching this conclusion, the District Court reasoned that:

> I don't think I can ignore the reality of what happened on 9/11, or who perpetrated on 9/11, and the pockets of deep and abiding hatred of the United States. . . . I think the Government's in a

> what the quantum of evidence is. That is so – so I'm not making my decision based on some analysis of the quantum of the evidence put forward by the defendant as to selective – I'm assuming that there is some form of selective prosecution going on, you know, in the sense that of the one percent, or whatever it is, that cheat on the exam, they're not uniformly nailing every one and charging them with mail fraud. And they have focused at least for the moment on people of Middle Eastern or Arab descent.

sense first duty in a way is to protect its own citizens from harm. And I can't say that this is an unconstitutional way of doing it.

Accordingly, the District Court denied Al Hedaithy's motion for discovery. At the conclusion of the hearing, Al Hedaithy made an oral motion to dismiss the superseding indictment based on selective prosecution, and that motion was also denied.

Thereafter, Al Hedaithy's case was tried before the District Court, as the finder of fact, based upon stipulated facts. After the close of evidence, Al Hedaithy was convicted of mail fraud and conspiracy to commit mail fraud under the superseding indictment, and was sentenced to one year probation and a $750 fine.[3] Al Hedaithy has filed a timely notice of appeal.[4]

## II.

Al-Aiban contends that our decision in *Panarella*, 277 F.3d at 685, requires that he be afforded an opportunity, pursuant to Rule 12(b)(3)(B) of the Federal Rules of Criminal Procedure,[5] to challenge the sufficiency of the superseding

---

[3]As with Al-Aiban, the conviction rendered Al Hedaithy ineligible to remain in the United States, and ineligible to return to the United States for at least five years. Al Hedaithy has also voluntarily departed the United States.

[4]The District Court exercised jurisdiction in these two criminal cases pursuant to 18 U.S.C. § 3231. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

[5]Fed. R. Crim. P. 12(b)(3)(B) provides:
> The following must be raised before trial: . . . a
> motion alleging a defect in the indictment or

12

indictment despite his unconditional guilty plea. The Government concedes that *Panarella* directly supports Al-Aiban's right to appeal, but argues that our decision in that case was overruled by the Supreme Court in *United States v. Cotton*, 535 U.S. 625 (2002). According to the Government, *Panarella* is therefore no longer controlling and Al-Aiban's guilty plea served as a waiver of his right to appeal. We reject the Government's interpretation of *Cotton* and hold that *Panarella* obligates us to reach the merits of Al-Aiban's appeal.

In *Panarella*, we expressly held that "Rule 12(b)(2)[6] and our cases applying this Rule permit a defendant who enters an unconditional guilty plea to argue on appeal that the specific facts alleged in the charging document do not amount to a criminal offense." 277 F.3d at 680. As in our case, the defendant in *Panarella* agreed to enter an unconditional plea of

information – but at any time while the case is pending, the court may hear a claim that the indictment or information fails to invoke the court's jurisdiction or to state an offense.

[6]*Panarella* applied Fed. R. Crim. P. 12(b)(2), which was the predecessor to Rule 12(b)(3)(B). The textual differences between the two versions of the rule represent alterations in form only, and "[n]o change in practice [was] intended." *See* Fed. R. Crim. P. 12(b)(3)(B) advisory committee note. The text of the rule relied upon in *Panarella* provided that:

The following must be raised prior to trial: . . . Defenses and objections based on defects in the indictment or information (other than that it fails to show jurisdiction in the court or to charge an offense which objections shall be noticed by the court at any time during the pendency of the proceedings).

Fed. R. Crim. P. 12(b)(2) (2001).

13

guilty. Despite the plea, the defendant subsequently appealed his conviction challenging the sufficiency of the superseding information. In arguing that he was entitled to raise the sufficiency of the information for the first time on appeal, the defendant presented two arguments. First, he claimed that the issue was a jurisdictional matter that could be raised at any time. Second, he argued that the plain text of Rule 12(b)(2), together with our previous interpretation of that rule, required the *Panarella* Court to reach the merits of his appeal notwithstanding the unconditional guilty plea. We agreed with the defendant's second argument and therefore declined to address his jurisdictional argument.

In addressing Rule 12(b)(2), we noted that we had already held squarely that the rule "applies equally to both objections raised before a District Court and objections raised for the first time before a Court of Appeals," *id.* (citing *Gov. of the Virgin Islands v. Pemberton*, 813 F.2d 626, 631 (3d Cir. 1987)), and that it applies "even where a defendant has entered an unconditional guilty plea." *Id.* at 683 (citing *United States v. Cefaratti*, 221 F.3d 502, 507 (3d Cir. 2000); *United States v. Spinner*, 180 F3d. 514, 516 (3d Cir. 1999)). We also declined the Government's invitation to apply Rule 12(b)(2) narrowly to cover only those cases in which the charging instrument completely neglected to mention an element of the offense. Instead, we felt compelled by our previous decisions to hold that

> for purposes of Rule 12(b)(2), a charging document fails to state an offense if the specific facts alleged in the charging document fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation. Therefore, notwithstanding [the defendant's] unconditional guilty plea, Rule 12(b)(2) permits [him] to argue for the first time on appeal that the specific facts alleged in the superseding information do not

14

amount to honest services wire fraud.

*Id.*[7]

In *Cotton*, a superseding indictment charged defendants with a conspiracy to distribute, and to possess with intent to distribute, a "detectable amount" of cocaine and cocaine base in violation of 21 U.S.C. §§ 846 and 841(a)(1). 535 U.S. at 627-28. The indictment did not, however, allege any drug quantities that would result in enhanced penalties under § 841(b). At trial, the jury was instructed, in accordance with the superseding indictment, that the amount of narcotics involved was not important and the defendants could be convicted as long as it found that a defendant conspired to distribute, or possessed with intent to distribute, the narcotics listed. Based on this instruction, the defendants were convicted. At sentencing, the District Court did not sentence the defendants under § 841(b)(1)(C) (which provided for imprisonment of not more than 20 years for drug offenses involving a "detectable amount" of cocaine or cocaine base), but instead made a finding that the defendants' conspiracy involved more than 50 grams of cocaine base, which implicated the enhanced penalties of § 841(b)(1)(A). *Id.* at 628. The District Court accordingly sentenced the defendants under the enhanced penalties, and the defendants did not object to the fact that their sentences were based on drug quantities not alleged in the indictment.

On appeal to the Fourth Circuit Court of Appeals, the defendants argued that their sentences were invalid under

---

[7]We nevertheless opined that this holding was unwise and urged the Judicial Conference Advisory Committee on Criminal Rules to consider amending Rule 12(b)(2). *Panarella*, 277 F.3d at 688.

*Apprendi v. New Jersey*, 530 U.S. 466 (2000).[8]  Because the *Apprendi* argument had not been raised in the District Court, the Fourth Circuit reviewed this challenge for plain error, but nonetheless vacated the defendants' sentences.  It reasoned that "'because an indictment setting forth all the essential elements of an offense is both mandatory and jurisdictional, . . . a court is without jurisdiction to . . . impose a sentence for an offense not charged in the indictment.'"  *Id.* at 629 (quoting 261 F.3d at 404-05).  The Supreme Court rejected this reasoning and reversed the Fourth Circuit's decision.

According to the Supreme Court, the omission of drug quantity from the indictment was not a "jurisdictional" defect.  The Court acknowledged that "defects in subject-matter jurisdiction require correction regardless of whether the error was raised in the district court," but nonetheless concluded that "defects in an indictment do not deprive a court of its power to adjudicate a case." *Id.* at 630.  Noting that it was "[f]reed from the view that indictment omissions deprive a court of jurisdiction," *id.* at 631, the Court proceeded to apply a plain error analysis under Fed. R. Crim. P. 52(b) and *United States v. Olano*, 507 U.S. 725, 731 (1993).  Although the Court concluded that the District Court's error in imposing an enhanced sentence was plain, it declined to address whether the defendants' substantial rights were affected because "the error did not seriously affect the fairness, integrity, or public reputation of judicial proceedings."  *Id.* at 632-33.  This was because, according to the Court, the evidence presented to the jury that the conspiracy involved more than 50 grams of cocaine base was overwhelming and essentially uncontroverted.

The Government interprets *Cotton* as holding that a defendant who fails to challenge the sufficiency of his indictment in the District Court cannot argue for the first time on

---

[8]*Apprendi* was decided while the defendants' appeal was pending.  535 U.S. at 628.

16

appeal that the indictment fails to state an offense, unless plain error review is satisfied. Such an interpretation sweeps too broadly. *Cotton* did not hold that a defendant can *never* argue for the first time on appeal that his indictment failed to state an offense. Rather, the Supreme Court's express holding was that "defects in an indictment do not deprive a court of its power to adjudicate a case." 535 U.S. at 630. In other words, the Court held that indictment defects are not "jurisdictional." *Id.* at 631. This holding, does not conflict with *Panarella*.

As noted above, the defendant in *Panarella* pursued a jurisdictional argument much like the one rejected in *Cotton*. We expressly declined to address that argument, however, noting that the authority relied on by the defendant as was "murky."[9] We instead based our holding on the language of

---

[9]In particular, we stated:

> Apart from Rule 12(b)(2), the source of law on which Panarella's "jurisdictional" argument rests remains murky; it is unclear to us whether the argument relies on the Fifth Amendment's Grand Jury Clause, putative statutory or Article III limits on federal courts' subject matter jurisdiction, or some rule of federal common law. Indeed, we are unsure whether use of the term "jurisdictional" to refer to challenges to the sufficiency of an indictment is anything more than simply a label used to announce the conclusion that a particular defense survives a guilty plea. *See* Peter Westen, *Away from Waiver: A Rationale for the Forfeiture of Constitutional Rights in Criminal Procedure*, 75 Mich. L. Rev. 1214, 1232 n.36 (1977) ("[O]nce we have explained why a certain category of defenses survives a plea of guilty, we may find it useful to describe the category as 'jurisdictional' defenses. But calling a defense

Rule 12(b)(2), which we treated as independent of any jurisdictional ground. *See id.* at 631 ("Because we hold that Rule 12(b)(2) requires us to entertain this appeal notwithstanding Panarella's unconditional guilty plea, we need not reach Panarella's alternative 'jurisdictional' argument for why this appeal survives his guilty plea."). Accordingly, the basis of our holding in *Panarella* was neither addressed nor rejected in *Cotton*.

The Government nonetheless insists that the defendants in *Cotton* raised an argument based on Rule 12(b)(2) and that the Supreme Court rejected it. In support of this contention, the Government suggests that the defendants argued in their briefing to the Supreme Court that Rule 12(b)(2) allowed them to bring their challenge to the indictment at any time, but the Court implicitly rejected the defendants' reliance on Rule 12(b)(2) by instead applying the plain error analysis of Rule 52(b). The Government's reasoning is in error.

Clearly, *Cotton* made no mention of Rule 12(b)(2), even though the rule was cited in the defendants' briefing. This was not surprising, however, given the manner in which the defendants in *Cotton* relied upon the Rule. Contrary to the Government's suggestion, the defendants never raised the argument that we accepted in *Panarella*. Rather, Rule 12(b)(2) was raised in the *Cotton* briefing merely as support for the uncontroversial proposition that a jurisdictional defect is one that may be raised at any time. *See* Supreme Court Brief for Respondents at 10, 20, No. 01-687, 2002 WL 463382 (2002).

---

'jurisdictional' is a conclusion, not an explanation: it does nothing to explain why the defense should be deemed to survive a guilty plea." (internal citation omitted)).

277 F.3d at 682 n.1. Our assessment of Panarella's jurisdictional argument was apparently prescient given the Supreme Court's rejection of this argument in *Cotton*.

18

Given that the defendants in *Cotton* never attempted to rely upon Rule 12(b)(2) as an independent ground for challenging a defective indictment, we do not construe *Cotton* as having rejected our holding in *Panarella* that such a ground exists.

Accordingly, *Panarella* dictates that Al-Aiban must be permitted, in accordance with Rule 12(b)(3)(B), to challenge for the first time on appeal the sufficiency of his superseding indictment. It is to that issue we now turn.

## III.

"'In order to be valid, an indictment must allege that the defendant performed acts which, if proven, constituted a violation of the law that he or she is charged with violating.'" *United States v. Zauber*, 857 F.2d 137, 144 (3d Cir. 1988) (quoting *United States v. Gimbel*, 830 F.2d 621, 624 (7th Cir. 1987)). Defendants' primary argument on appeal is that the facts alleged in the superseding indictments, as a matter of law, do not constitute a conspiracy to violate, or a violation of, the federal mail fraud statute, 18 U.S.C. § 1341. The question presented is whether these superseding indictments adequately alleged that Defendants engaged in a scheme to defraud ETS of a traditionally recognized property interest. We will first review the applicable law, and then address the Government's argument that the superseding indictments sufficiently allege mail fraud violations under well-established theories of mail fraud liability. We will next address several arguments advanced by Defendants for the proposition that the superseding indictments do not implicate the mail fraud statute. Finally, we conclude that the superseding indictments sufficiently alleged mail fraud violations.[10]

---

[10]The question of whether the superseding indictments alleged facts that are within the ambit of the mail fraud statute is a question of statutory interpretation subject to plenary

A.

The federal mail fraud statute, 18 U.S.C. §1341 provides, in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do, [uses the mails or causes them to be used], shall be fined under this title or imprisoned not more than 20 years, or both.

"To prove mail or wire fraud, the evidence must establish beyond a reasonable doubt (1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of the mails or interstate wire communications in furtherance of the scheme." *United States v. Antico*, 275 F.3d 245, 261 (3d Cir. 2001) (citing *United States v. Clapps*, 732 F.2d 1148, 1152 (3d Cir.1984)). A sufficient charging document must therefore allege the foregoing three elements.[11] Additionally, the object of the alleged scheme or artifice to defraud must be a traditionally recognized property right. *United States v. Henry*, 29 F.3d 112, 115 (3d Cir. 1994) ("[T]o determine whether a particular interest is property for purposes of the fraud statutes, we look to whether the law traditionally has recognized and enforced it as a property right."). This rule is embodied in a trilogy of Supreme Court

---

review. *See Panarella*, 277 F.3d at 685.

[11]It is undisputed in this case that the superseding indictments adequately allege use of the mails as the predicate for application of § 1341.

cases that, each party agrees, governs the outcome of this appeal: *McNally v. United States*, 483 U.S. 350 (1987), *Carpenter v. United States*, 484 U.S. 19 (1987), and, most recently, *Cleveland v. United States*, 531 U.S. 12 (2000). We agree that these three decisions must frame our analysis, and we review each in turn.

1.

In *McNally*, the defendants were charged with, and convicted of, violating § 1341 by devising a scheme to defraud the Commonwealth of Kentucky's citizens and government of their "intangible right" to have the Commonwealth's affairs conducted honestly. 483 U.S. at 352. The Supreme Court was asked to determine whether the deprivation of "honest services" fell within the scope of the mail fraud statute. In addressing this issue, the Court was required to review the legislative history of the statute. The Court noted that that the original statute, enacted in 1872, referred solely to "any scheme or artifice to defraud." *Id.* at 356. The sparse legislative history of that enactment "indicate[d] that the original impetus behind the mail fraud statute was to protect the people from schemes to deprive them of their money or property." *Id.* The Court also noted that Congress subsequently amended the mail fraud statute in 1909, "add[ing] the words 'or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises' after the original phrase 'any scheme or artifice to defraud.'" *Id.* at 357.

> Because the two phrases identifying the proscribed schemes appear in the disjunctive [*i.e.*, "any scheme . . . to defraud, *or* for obtaining money or property"], it is arguable that they are to be construed independently and that the money-or-property requirement of the latter phrase does

21

> not limit schemes to defraud to those aimed at
> causing deprivation of money or property.

*Id.* at 358. In fact, according to the Court, that is exactly the approach taken by the several courts that interpreted "schemes to defraud" as including those schemes designed to deprive victims of things other than money or property, such as "honest services." *Id.* The Supreme Court, however, rejected such an approach.

The Court recognized that it had long ago held that "the words 'to defraud' commonly refer 'to wrongdoing one in his property rights by dishonest methods or schemes,' and usually signify the deprivation of something of value by trick, deceit, chicane, or overreaching.'" *Id.* (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924)). Congress' 1909 amendment of the statute, the Court held, did not alter this understanding of the words "to defraud." Rather, "adding the second phrase simply made it unmistakable that the statute reached false promises and misrepresentations as to the future as well as other frauds involving money or property." *Id.* at 359. Accordingly, the Supreme Court decided that § 1341 must be read "as limited in scope to the protection of property rights." *Id.* at 360.[12] As such, the Court held that a scheme to deprive

---

[12]In reaching this holding, the Court noted that it was applying the rule that:

> When there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language. . . . As the Court said in a mail fraud case years ago: "There are no constructive offenses; and before one can be punished, it must be shown that his case is plainly within the statute." *Fasulo v. United States*, 272 U.S. 620, 629, 47 S. Ct. 200, 202, 71

the Commonwealth of Kentucky of "honest services" was not within the scope of § 1341 and therefore reversed the defendants' convictions. *Id.* at 361.[13]

2.

The Supreme Court next addressed the mail fraud statute in *Carpenter*, in which the defendant was alleged to have violated that statute by defrauding the Wall Street Journal (the "Journal") of "confidential business information." 484 U.S. at 24. One of the defendants, a reporter for the newspaper, wrote a regular column discussing selected stocks and giving positive and negative information about those stocks. The Journal's policy was that before the publication of each column, its contents were the Journal's confidential information. *Id.* at 23. Despite that policy, the defendant entered into a scheme by

---

L. Ed. 443 (1926). Rather than construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials, we read § 1341 as limited in scope to the protection of property rights. If Congress desires to go further, it must speak more clearly than it has.

483 U.S. at 360.

[13]It should be noted that Congress responded to *McNally* by enacting 18 U.S.C. § 1346. In doing so, Congress brought within § 1341 the proscription against "schemes or artifices to deprive another of the intangible right of honest services." 18 U.S. C. § 1346. Also in response to *McNally*, Congress amended § 1341 to add a proscription against counterfeiting. Neither of these modifications, however, are relevant in this case.

which he gave employees of a brokerage firm advance information as to the timing and contents of the column. Those brokers then traded on the prepublication information.

After the scheme was revealed, the reporter and the brokers were charged with violations of the securities laws and the mail and wire fraud statutes. The issue addressed by the Supreme Court was whether the contents of the Journal column, which were fraudulently misappropriated by the reporter, constituted "money or property" under the mail and wire fraud statutes in light of *McNally*.[14] In affirming the defendant's conviction, the Court noted that this was not a case like *McNally*. According to the Court, the Journal, as the defendant's employer,

> was defrauded of much more than its contractual right to his honest and faithful service, an interest too ethereal in itself to fall within the protection of the mail fraud statute, which "had its origin in the desire to protect individual property rights." *McNally, supra,* at 359, n.8, 107 S. Ct., at 2881, n.8. Here, the object of the scheme was to take the Journal's confidential business information – the publication schedule and contents of the "Heard" column – and its intangible nature does not make it any less "property" protected by the mail and wire fraud statutes. *McNally* did not limit the scope of § 1341 to tangible as distinguished from intangible property rights.

*Id.* at 25. The Court reasoned that "confidential business

---

[14]The Court noted that "[t]he mail and wire fraud statutes share the same language in relevant part, and accordingly we apply the same analysis to both sets of offenses here." 484 U.S. at 25 n.6.

24

information has long been recognized as property," and the Journal "had a property right in keeping confidential and making exclusive use, prior to publication, of the schedule and contents of [its] column." *Id.* at 26 (citations omitted).

Additionally, the Court rejected the defendant's argument that a scheme to defraud required a monetary loss. Rather, the Court held, "it is sufficient that the Journal has been deprived of its right to exclusive use of the information, for exclusivity is an important aspect of confidential business information and most private property for that matter." *Id.* at 26-27.

The Court also rejected the defendant's argument that his conduct amounted to no more than a violation of workplace rules and did not constitute fraudulent activity. Contrary to the defendant's assertion, the Court concluded that he had clearly "defrauded" the Journal under the "common understanding" of that word, as previously set forth in *McNally*: "wrongdoing one in his property rights by dishonest methods or schemes." *Id.* at 27. Embezzlement, the Court noted, falls under this definition. Accordingly, the Court "ha[d] little trouble in holding that the conspiracy here to trade on the Journal's confidential information is not outside the reach of the mail and wire fraud statutes." *Id.* at 28.

3.

Finally, in *Cleveland*, the defendant was charged and convicted of violating the mail fraud statute by making false statements in applying to the Louisiana State Police for a license to operate video poker machines. 531 U.S. at 15. The question addressed by the Supreme Court was whether the Louisiana video poker license qualified as "property" within the scope of § 1341. In deciding this issue, the Court held that "[i]t does not suffice . . . that the object of the fraud may become property in the recipient's hands; for purposes of the mail fraud statute, the thing obtained must be property in the hands of the victim." *Id.*

25

at 15.   Accordingly, the Supreme Court went on to consider "whether a government regulator parts with 'property' when it issues a license." *Id.* at 20.   In analyzing this issue, the Court first noted that Louisiana's "core concern" in issuing licenses was regulatory, and, as such, Louisiana law established a typical regulatory program for issuing video poker licenses. *Id.* at 20-21.   The function of this regulatory scheme, according to the Court, resembled other licensing schemes that have long been characterized as the exercise of state police powers.

The Court rejected the assertion that Louisiana had a property interest in its licenses merely because of the substantial sums of money it receives in exchange for each license.   The Court acknowledged that Louisiana had a substantial economic stake in the video poker industry, but also noted that the lion's share of fees received by the state with respect to the licenses is received only after the license is issued; not pre-issuance. Moreover, the Court reasoned that: "[w]ere an entitlement of this order sufficient to establish a state property right, one could scarcely avoid the conclusion that States have property rights in any license or permit requiring an upfront fee, including drivers' licenses, medical licenses, and fishing and hunting licenses." *Id.* at 22.

The Court also rejected the assertion that the licenses were property because of the state's significant control over the issuance, renewal, suspension, and revocation of the licenses. According to the Court, "Louisiana's right to choose the persons to whom it issues video poker licenses" was not a an interest long recognized as property. *Id.* at 23.   Rather, such "intangible rights of allocation, exclusion, and control amount to no more and no less than Louisiana's sovereign power to regulate.  . . . Even when tied to an expected stream of revenue, the State's right of control does not create a property interest any more than a law licensing liquor sales in a State that levies a sales tax on liquor.   Such regulations are paradigmatic exercises of the States' traditional police powers." *Id.*

26

The Court further rejected the Government's assertion that Louisiana's licensing power was no different than a franchisor's right to select its franchisees. The crucial difference between these two rights, the Court stated, is that "a franchisor's right to select its franchisees typically derives from its ownership of a trademark, brand name, business strategy, or other product that it may trade or sell in the open market." *Id.* at 24. Louisiana's authority, on the other hand, rested not upon any such asset but upon the state's "sovereign right to exclude applicants deemed unsuitable to run video poker operations." *Id.*

Because the Court concluded that the video poker license at issue was not property in the hands of the State of Louisiana, it held that the defendant's conduct did not fall within the scope of the mail fraud statute, and therefore reversed the defendant's conviction.

## B.

According to the Government, the superseding indictments advance theories of mail fraud liability that comport with the Supreme Court's decisions in *McNally*, *Carpenter*, and *Cleveland.* The Government argues, *inter alia*, that the superseding indictments properly allege that ETS was defrauded of at least two traditionally recognized property interests: (1) its confidential business information, and (2) its tangible score reports. We address each of these theories below.[15]

___

[15]The Government also advances theories of mail fraud liability based upon the allegation that ETS was defrauded out of its goodwill, its test administration and scoring services, and its TOEFL product as a whole. Because we agree that the superseding indictments sufficiently allege mail fraud violations with respect to ETS's confidential business information and score reports, we need not address any additional theories upon

27

1.

As noted above, the superseding indictments alleged that ETS possesses a property interest in the materials bearing its trademarks and its copyrighted materials, "such as the TOEFL exam and its questions."[16] The superseding indictments sufficiently alleged, according to the Government, that the TOEFL exam and its questions constituted the confidential business information of ETS. The Government contends that this case is like *Carpenter* inasmuch as the superseding indictments allege that the Defendants' scheme required the hired test-takers to make a misrepresentation to ETS in order to gain access to, and sit for, the TOEFL exam. We agree with the Government's analysis.

"'Confidential information acquired or compiled by a corporation in the course and conduct of its business is a species of property to which the corporation has the exclusive right and benefit.'" *Carpenter*, 484 U.S. at 320 (quoting 3 W. Fletcher, *Cyclopedia of Law of Private Corporations* § 857.1, at 260 (rev. ed. 1986)). Such information includes trade secrets, *see id.* (citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001-04 (1984)), which are defined as "'any formula, pattern, device or compilation of information which is used in one's business, and

---

which the superseding indictments may be advanced.

[16]We note that Defendants devote extensive discussion to their contention that ETS's trademarks and copyrights are not property interests cognizable under the mail fraud statute. We do not address this argument because, as our discussion indicates, it has no relevance here. The superseding indictments do not allege that ETS was defrauded of its trademarks and copyrights, but rather the materials bearing those trademarks, and the materials protected by copyright. The dispositive question is whether those materials themselves are property.

28

which gives him an opportunity to obtain an advantage over competitors who do not know or use it.'" *Ruckelshaus*, 467 U.S. at 1001 (quoting *Restatement (Second) of Torts* § 757, cmt. b). In our case, ETS's TOEFL exam satisfies this definition. According to the indictments, ETS is in the business of preparing and administering the TOEFL exam. The examination provided ETS with a competitive advantage over others in the business of test administration insofar as performance on the exam, according to the indictments, was the yardstick by which educational institutions measured English proficiency in their admissions processes. The indictments also indicate that ETS therefore goes to great lengths to protect the confidentiality and exclusivity of its exam. No person is permitted access to sit for the TOEFL exam unless he pays a fee, promises to preserve the confidentiality of the exam, and represents to ETS that he is the person whose name and address were used in applying to sit for the exam. The facts alleged in the superseding indictment are therefore sufficient to conclude that the TOEFL exam and its questions were confidential business information. The only question remaining with respect to this theory of mail fraud liability is whether Defendants engaged in a scheme "to defraud" ETS of such property.

As we set forth above, *McNally* held that "the words 'to defraud' commonly refer 'to wrongdoing one in his property rights by dishonest methods or schemes,' and usually signify the deprivation of something of value by trick, deceit, chicane, or overreaching.'" 483 U.S. at 358 (quoting *Hammerschmidt*, 265 U.S. at 188). In accordance with *McNally*, we consider whether the superseding indictments allege that Defendants engaged in a scheme to deprive ETS of a property right in its confidential business information, and whether that deprivation was accomplished through dishonest means.

*Carpenter* dictates that ETS "had a property right in keeping confidential and making exclusive use" of its confidential business information. 484 U.S. at 26. *Carpenter*

29

further instructs that the Government need not allege that ETS suffered a monetary loss. *Id.* ("Petitioners cannot successfully contend . . . that a scheme to defraud requires a monetary loss, such as giving the information to a competitor.").[17]  Rather, for purposes of showing a mail fraud violation, it is sufficient to allege that ETS "has been deprived of its right to exclusive use of the [confidential business] information." *Id.* at 26-27.  Such deprivation was clearly set forth in the superseding indictments.

According to the indictments, ETS assiduously protected the exclusivity of its TOEFL exam, allowing access only to those persons who agreed to keep the exam confidential and who provided a representation as to their identity.  Defendants' alleged scheme, however, required hired test-takers to gain access to ETS's TOEFL exam on terms other than those prescribed by ETS.  The indictments allege that ETS would not have allowed the hired test-takers to sit for the exam had it known that they were not actually the Defendants, and had it known that they did not actually agree to preserve the exam's confidentiality.  Accordingly, it was sufficiently alleged that ETS was deprived of a recognized property interest: the "right to decide how to use" its confidential business information, *i.e.*, the TOEFL exam.

Finally, the scheme alleged in the superseding indictments required hired test-takers to falsely identify themselves as each Defendant, thereby misrepresenting to ETS their true identities.  The scheme further required the hired test-takers to sign ETS's confidentiality statement in the name of each Defendant, giving ETS the false impression that the signatories had agreed to preserve the confidentiality of the TOEFL exam.  We therefore have little trouble concluding that

---

[17]Accordingly, insofar as Defendants contend that the Government was required to allege that ETS "lost" its confidential business information, we reject those contentions as foreclosed by *Carpenter*.

the superseding indictments sufficiently alleged that the deprivation of ETS's property right was accomplished through deceit, trickery, chicanery, or other fraudulent means.

Defendants insist, however, that the theory of mail fraud liability that was adopted in *Carpenter* is not applicable here. They contend that the alleged scheme did not interfere with any effort by ETS to keep its test confidential. To the contrary, Defendants argue, the hired test-takers received the same test materials at the same time as everyone else who paid ETS's fee, and like everyone else they returned those materials to ETS at the end of the designated time. According to Defendants, after the alleged scheme was completed, ETS had exactly the same interests in the TOEFL exam as it had before, and ETS was free to continue to use the exam. These arguments are unconvincing.

Contrary to Defendants' claims, the superseding indictments clearly alleged that the Defendants' scheme interfered with ETS's efforts to keep its test confidential. Here, the hired test-takers were not otherwise entitled to gain access to the TOEFL exam. As noted above, their misrepresentations deprived ETS of the ability to choose which individuals would be permitted such access. Moreover, the fact that the hired test-takers received the same test materials at the same time as everyone else is irrelevant to the confidentiality of the test. Defendants appear to suggest that the TOEFL exam was no longer confidential business information once all test-takers received it. That suggestion, however, misconstrues the facts alleged in the indictments. According to the superseding indictments, ETS requires each person who sits for the TOEFL exam, in accordance with the confidentiality statement, to undertake a continuing obligation to keep the exam confidential. The hired test-takers, however, did not sign the confidentiality statement in their own names and were therefore not bound by the same obligations that legitimate test-takers agreed to. After the alleged scheme was complete, therefore, the TOEFL exam was no longer confidential vis-á-vis the hired test-takers.

31

Accordingly, we reject the contention that ETS would have exactly the same interests in its TOEFL exam as it had before the alleged scheme was complete.

2.

The Government also contends that the superseding indictments clearly alleged that ETS was defrauded of tangible property. As we noted above, the indictments alleged that ETS possesses a property interest in the "materials bearing its trademarks, such as the TOEFL . . . score report." The same misrepresentations that the hired test-takers made in order to gain access to the TOEFL exam, the Government claims, were also used to fraudulently obtain tangible documents from ETS. In accordance with the alleged scheme, these documents bore the name of each Defendant, but in fact reflected both the photograph of, and the exam score achieved by, the hired test-taker. Defendants do not dispute that the scheme alleged in the indictments involved obtaining the TOEFL score reports through misrepresentations. Rather, they contend that these documents cannot be considered property cognizable under the mail fraud statute. While Defendants' argument merits some discussion, we conclude that it is ultimately unavailing.

As Defendants suggest, *Cleveland* dictates that, in order to be cognizable under the mail fraud statute, the score reports must be considered property in the hands of ETS. Defendants insist, however, that a score report does not exist except to be given to the test-taker, that ETS cannot use it for any other purpose, and that ETS cannot sell one person's score report to any other person. Rather, according to Defendants, it is nothing more than the embodiment of the services that ETS provides, and that the paper and ink used to create a score report does not make it property. Defendants also argue that, because *Cleveland* clearly holds that a such a score report would not be property if it was issued by a governmental entity, to hold that ETS's score

32

report is property in the hands of ETS would create a serious anomaly whereby the Defendants' alleged scheme would not be considered mail fraud if it related to a state licensing examination, such as a bar exam or a medical licensing exam, but would be considered mail fraud with respect to the TOEFL exam, the Scholastic Aptitude Test, the Law School Admissions Test, or any other privately administered standardized test.

As to Defendants' first contention – that the score reports are not property in the hands of ETS – we disagree. ETS is alleged to be in the business of administering the TOEFL exam and issuing score reports. While it is true that the score reports represent the end result of the services provided by ETS, they are nonetheless tangible items produced by ETS, and ETS reserves the right to convey these items only to those individuals who meet its prescribed conditions. We do not think it credible for Defendants to contend that tangible items, held in the physical possession of a private entity, are not property. To the extent that Defendants pursue this argument, we construe it as a contention that the mail fraud statute does not apply to property with *de minimus* value.

In support of a *de minimus* exception to the mail fraud statute, Defendants cite to *United States v. Schwartz*, 924 F.2d 410, 417-18 (2d Cir. 1991) and *United States v. Granberry*, 908 F.2d 278, 280 (8th Cir. 1990). Both *Schwartz* and *Granberry* addressed the question of whether unissued licenses were property in the hands of a governmental entity for purposes of the federal fraud statutes. Correctly foretelling the outcome in *Cleveland*, both Courts held that such unissued licenses were not property. *Schwartz* and *Granberry* also addressed the Government's argument that the licenses were nonetheless property by virtue of the paper they were printed on. In rejecting this argument, the Second Circuit stated:

> This proposition is patently absurd. In the present instance, the [governmental entity] was not in the

33

paper and ink business, it is a regulatory agency with the power to grant or withhold a license. The paper licenses given appellants were merely the expression of its regulatory imprimatur, and they had no other effect as "property" beyond their role as representatives of this regulatory grant. . . . Further, the value of the paper, ink and seal at issue is plainly inconsequential and – as *McNally* held that "to defraud" meant depriving individuals or the government of something of value – must be deemed *de minimis* as a matter of law.

*Schwartz*, 924 F.2d at 418 (citations omitted). *Granberry* rejected a similar argument, stating:

A governmental permit may in some sense be property in the hands of the person who receives it, but licensing authorities have no property interest in licenses or permits, and allegations that they were obtained by fraud are not sufficient to state an offense under Section 1341. The physical piece of paper that represents the permit is tangible enough, but it is simply negligible – de minimis as a matter of law and insignificant as a matter of fact, apart from the legal entitlement it represents.

908 F.2d at 280 (citation omitted).

*Schwartz* and *Granberry* are, of course, both distinguishable from the case before us in that ETS is not a governmental licensing entity. Accordingly, the primary rationale for holding that the licenses in those cases were not property within the meaning of the federal fraud statutes is not

applicable here. It is thus certainly possible to attribute *Schwartz*'s and *Granberry*'s rejection of the Government's attempts to salvage its indictments, by arguing that the licenses were property due to their tangibility, to the Courts' conclusion that the unissued licenses were not property in any case. Nevertheless, it is also possible to read *Schwartz* and *Granberry* as recognizing a *de minimus* exception to the mail fraud statute regardless of whether the victim is a governmental licensing entity. Even if we read *Schwartz* and *Granberry* in the manner suggested by Defendants, however, we must reject their arguments because our recognition of a generally applicable *de minimus* exception would conflict with a prior decision of this Court.

In *United States v. Martinez*, 905 F.2d 709, 715 (3d Cir. 1990), we took the position that unissued governmental licenses were property within the meaning of the mail fraud statute. Although this holding was later overruled by the Supreme Court in *Cleveland*, at least some of the rationale for our decision in *Martinez* lives on. The defendant in that case presented several arguments in support of his contention that a medical license issued by the Commonwealth of Pennsylvania was not property within the meaning of the mail fraud statute. One of these arguments was that "someone who fraudulently acquires property that has great value once acquired[] has not violated the mail fraud statute if the item acquired had no, or negligible, value in the hands of the victim." *Id.* at 713. Whereas *Schwartz* and *Granberry* may be read to have accepted this argument, we found no support for it:

> Nothing in the statutory language supports [the defendant's] theory. The statute, which proscribes "obtaining money or property," is broad enough to cover a scheme to defraud a victim of something that takes on value only in the hands of the acquirer as well as a scheme to

35

defraud a victim of property valuable to the victim but valueless to the acquirer.

Martinez points to the language in *McNally* that "the original impetus behind the mail fraud statute was to protect the people from schemes to deprive them of their money or property." 483 U.S. at 356, 107 S. Ct. at 2879. Arguably, taken out of context, this could signify that the statute applies only when the victim has been deprived of a valuable property right. However, the Court was clearly not focusing on the technical argument made here by Martinez but only on the issue presented in that case – whether property includes the ethereal right to honest government.

*Id.* We also found it significant that, in *Carpenter*, the Supreme Court held that no allegation of a monetary loss to the victim was required, but that the deprivation of a property interest alone was sufficient to constitute a mail fraud violation. Accordingly, we rejected the general proposition that the mail fraud statute is not implicated if the property defrauded has no value in the hands of the victim.[18]

Our analysis of this issue in *Martinez* survives the Supreme Court's decision in *Cleveland*. In *Cleveland*, the Supreme Court held that Louisiana's unissued video poker license was not "property" in the first instance because it was merely representative of the state's sovereign power to regulate. 531 U.S. at 21. In *Martinez*, however, we assumed (albeit

---

[18]We went on to reason in *Martinez*, however, that, even if we accepted the defendant's construction of the mail fraud statute, we would nonetheless conclude that the medical licenses at issue did have value in the hands of the Commonwealth. 905 F.2d at 713.

incorrectly) that an unissued license *was* "property" in the hands of the Commonwealth, and held that the license was not stripped of its status as "property" merely because it had negligible value in the hands of the Commonwealth. Thus, in our case, where we have no doubt that tangible pieces of paper held in the possession of a private entity are "property," *Martinez* dictates that these items are no less "property" simply because they have negligible value.

The D.C. Circuit Court of Appeals' decision in *United States v. DeFries*, 43 F.3d 707, 707-08 (D.C. Cir. 1995), is also persuasive on this issue. In *DeFries*, several union officials were charged with mail fraud for the alleged theft, alteration, and destruction of ballots in a 1988 union merger referendum. The District Court dismissed the indictment on the ground that the theft of ballots did not constitute significant enough deprivations and thus, under *McNally*, were not cognizable under § 1341. In defending that dismissal on appeal, the defendants conceded that the ballots were the tangible property of the union, but argued that they were of such *de minimus* value – worth no more than the paper or ink used in their printing – that they failed to meet some threshold standard of significance implicit in the mail fraud statute. Responding to this argument, the D.C. Circuit stated:

> It is difficult to see where the defendants find this *de minimis* exception. The mail fraud statute speaks only of "money or property" generally, not of property above a certain value. *McNally* incidentally quotes language from a 1924 case suggesting that the words "'to defraud' . . . usually signify the deprivation of *something of value* by trick, deceit, chicane or overreaching," 483 U.S. at 358, 107 S. Ct. at 2881 (emphasis added) (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S. Ct. 511, 512, 68 L. Ed.

37

968 (1924)), but it does so simply to demonstrate that the mail fraud statute protects only traditional forms of property; there is no suggestion that once the subject of a fraud *is* determined to be property, it must additionally meet some threshold of value.

*Id.* at 709. Accordingly, the Court expressed significant doubts regarding the *de minimus* exception recognized in *Schwartz* and *Granberry*. Nonetheless, the Court concluded that it need not decide the issue because the ballots in question had more than *de minimus* value:

> Here the tangible property taken was not only substantially greater in scale than the single sheets of paper at issue in the two *de minimis* cases, but was also the sole physical embodiment of valuable information about member preferences, information that was costly to produce and would be at least as costly to recreate. That this information was of more than *de minimis* value to the union is made clear by the organization's willingness to commit substantial resources to gathering it: as detailed in the indictment, the merger election involved the printing, national distribution, collection, and processing of thousands of official ballots at significant union expense. *Cf. Carpenter*, 484 U.S. at 26, 108 S. Ct. at 320-21 (noting that efforts spent to generate and compile business information support the claim of a property interest in that information). The defendants' alleged theft, alteration, and destruction of some of those ballots invalidated the entire enterprise and undid the union's investment. Indeed, even if it were actually proven at trial that the defendants tampered with

38

fewer ballots than necessary to turn the election, the theft would nevertheless undermine the election's credibility – and thus the value of the union's entire investment in the process – if accompanied by evidence of a risk of broader wrongdoing.

*Id.* at 710. The D.C. Circuit also went on to address the defendants' argument that the ballots merely represent the union's interest in democratic self-governance, which was found inadequate in *McNally*. The Court rejected this argument, reasoning that it confused means and ends: "[a] piece of property does not lose its status as such, nor is its value any less substantial, simply because it is held for ends that are abstract and that thereby seem non-property-like." *Id.* at 710-11. Accordingly, the Court reinstated the indictment, finding that the referendum ballots and the information that they embodied indeed constituted property under § 1341.

We are confronted with circumstances nearly identical to *DeFries*, and we find the D.C. Circuit's analysis persuasive. Here, even assuming the existence of a *de minimus* exception under the mail fraud statute, the superseding indictments sufficiently allege that the score reports obtained under Defendants' scheme were valuable. Like the ballots in *DeFries*, ETS's score reports are the sole physical embodiment of substantial and valuable services that ETS provides. Moreover, even though the Defendants' scheme allegedly defrauded ETS of only approximately sixty score reports, the fraud allegedly perpetrated on ETS (like the theft of union ballots in *DeFries*) undermined its credibility, "and thus the value of [its] entire investment in the process." *Id.* Insofar as the superseding indictments allege that ETS has developed substantial goodwill due to the integrity of its TOEFL testing process, we conclude that such goodwill makes ETS's score reports valuable, exceeding any potential *de minimus* threshold that may be

39

required by the mail fraud statute.

As to Defendants' second contention – that finding ETS's score report to constitute property would lead to a result inconsistent with *Cleveland* – such an argument misunderstands the fundamental basis of the Supreme Court's reasoning in that case. As we explained above, the result in *Cleveland* was based upon the conclusion that the issuance of government licenses is an exercise of a state's police powers to regulate. Because the issuance of such a license is a component of the state's regulatory scheme, the license was held not to be "property" in the hands of the regulator. Such reasoning is wholly inapplicable in this case. Here, ETS is a private business that provides a service and reports test results in pursuit of a profit-seeking endeavor. Unlike a state, ETS has no sovereign power to regulate.

Moreover, the Court in *Cleveland* made several observations in reaching its holding that are crucial to our analysis. Significantly, the Court rejected the Government's argument that Louisiana's licensing power was akin to a franchisor's right to select franchisees. The Court noted that "a franchisor's right to select its franchisees typically derives from its ownership of a trademark, brand name, business strategy, or other product that it may trade or sell in the open market." 531 U.S. at 24. Louisiana's licensing authority, the Court noted, does not rest on any similar asset, but rather upon its sovereign right to exclude applicants it deems unsuitable. Unlike the State of Louisiana, ETS's power to issue score reports, which are relied upon by educational institutions, rests squarely on its ownership of the "ETS" trademark and the copyrights to its various examinations. Unlike a sovereign state, ETS can sell its "licensing authority" to others. We therefore conclude that our decision in this case is not at all inconsistent with the Supreme Court's holding in *Cleveland.*

Our conclusion that this case differs significantly from *Cleveland* is well illustrated by the Sixth Circuit's decision in

40

*United States v. Frost*, 125 F.3d 346 (6th Cir. 1997). In that case, the Court held that the University of Tennessee has a property interest in its unissued diplomas under the mail fraud statute, notwithstanding the fact that governmental entities do not have a property interest in their unissued licenses:

> In general, the concept of "property" refers to a "bundle of rights" which includes the rights to possess, use, exclude, profit, and dispose. *See Brotherton v. Cleveland*, 923 F.2d 477, 481 (6th Cir. 1991). Although we have recognized that a degree is a property interest of the graduate, *see Crook v. Baker*, 813 F.2d 88, 98-99 (6th Cir. 1987), we also have held that the government does not have a property right in a license which it has not issued yet for the purposes of the mail fraud statute. *See Murphy*, 836 F.2d at 253-54; *see also United States v. Kato*, 878 F.2d 267, 269 (9th Cir. 1989) (under mail fraud statute, unissued pilot license is not property of government); *but see United States v. Salvatore*, 110 F.3d 1131, 1139-43 (5th Cir.1997) (unissued video poker license is property of government for purposes of mail fraud). We believe that an unissued university degree differs from an unissued regulatory license. Ultimately, a university is a business: in return for tuition money and scholarly effort, it agrees to provide an education and a degree. The number of degrees which a university may award is finite, and the decision to award a degree is in part a business decision. Awarding degrees to inept students, or to students who have not earned them, will decrease the value of degrees in general. More specifically, it will hurt the reputation of the school and thereby

41

impair its ability to attract other students willing to pay tuition, as well as its ability to raise money. The University of Tennessee therefore has a property right in its unissued degrees[.]

*Id.* at 367. We see no principled distinction between the unissued diplomas in *Frost* and ETS's score reports in this case.

In accordance with the foregoing, we hold that the superseding indictments sufficiently alleged that Defendants engaged in a scheme to defraud ETS of traditionally recognized property interests in its confidential business information and TOEFL score reports.[19]

## C.

In holding that the superseding indictments sufficiently allege mail fraud violations, we must also consider three additional arguments advanced by Defendants. First, they argue that, in order to sufficiently state a violation, a mail fraud charge must include an allegation that their scheme was designed to actually "obtain" the victim's property.[20] Second, and relatedly, Defendants suggest that our Court in *United States v. Zauber*,

---

[19]Because the Government's theories of property rights in this case are consistent with traditional concepts of property, we need not address Defendants' arguments with respect to the rule of lenity. *See Cleveland*, 531 U.S. at 24.

[20]We note, however, that this argument would only implicate our analysis of the Government's theory of mail fraud liability with respect to the deprivation of ETS's confidential business information. As for ETS's score reports, however, Defendants' argument is inapposite because the superseding indictments clearly allege that the Defendants's scheme was designed to obtain the TOEFL score reports.

42

857 F.2d 137 (3d Cir. 1988), and the Supreme Court in *Cleveland*, have categorically rejected the contention that the "right to control" one's property is itself a property interest. Third, they insist that ETS could not have been defrauded of any property because Defendants fully paid the fee required by ETS to sit for the TOEFL exam and receive a score report. We address each of these arguments in turn.

1.

We reject Defendants' first argument, primarily because it is inconsistent with the Supreme Court's decision in *Carpenter*. Although the defendants in *Carpenter* clearly "obtained" the Journal's confidential business information, this was not the conduct, according to the Court, that constituted the mail fraud violation. Rather, the conduct on which the Court focused was the act of fraudulently depriving the Journal of the exclusive use of its information.

Furthermore, Defendants' argument misconstrues the language of other relevant decisions. For example, they rely upon the Supreme Court's statement in *Cleveland* that "[i]t does not suffice, we clarify, that the object of the fraud may become property in the recipient's hands; for purposes of the mail fraud statute, the thing obtained must be property in the hands of the victim." 531 U.S. at 15. The context in which this statement was written, however, clarifies that the Court was not setting out a requirement that a mail fraud scheme must be designed to "obtain" property. Rather, this language reflects the Court's conclusion that a victim has been defrauded of "property," within the meaning of the mail fraud statute, only if that which the victim was defrauded of is something that constitutes "property" in the hands of the victim.

Defendants also insist that their interpretation of the mail fraud statute is supported by the Supreme Court's holdings, in *McNally* and *Cleveland*, that § 1341's second clause – "or for

43

obtaining money or property by means of false or fraudulent promises" – "simply modifies" the first clause – "any scheme or artifice to defraud." *McNally*, 483 U.S. at 359; *Cleveland*, 531 U.S. at 26. Defendants construe this language as meaning that any violation of the mail fraud statute must involve a scheme for obtaining the victim's property. We do not read *McNally* or *Cleveland* as providing any such requirement. In *McNally*, the language relied upon by Defendants was used by the Court in rejecting the Government's argument that the first clause of § 1341 could be read alone without reference to the second clause. In *Cleveland*, this language was used by the Court in rejecting the Government's argument that the second clause could be read alone without reference to the first clause. In neither case, however, did the Court hold that a mail fraud violation requires that the second clause of § 1341 be satisfied.

We explained the interaction between the first and second clauses of § 1341 in *United States v. Thomas*, 315 F.3d 190 (3d Cir. 2002), in which we stated that "Congress intended the second dependent clause of the mail fraud statute to broaden the scope of the first clause. The mail fraud statute was thus intended to cover 'any scheme or artifice to defraud [one of his money or property],' *including* any '[scheme] for obtaining money or property by means of false or fraudulent . . . promises.'" *Id.* at 198 (quoting *McNally*, 483 U.S. at 351) (second alteration in original). Under Defendants' interpretation of § 1341, however, the statute would cover "any scheme or artifice to defraud [one of his money or property]," *but limited to* any "[scheme] for obtaining money or property." Such an interpretation contravenes our holding in *Thomas* and we must therefore reject it.[21]

---

[21]Accordingly, we reject Defendants' reliance upon *Scheidler v. National Organization of Women, Inc.*, 537 U.S. 393 (2003), as unavailing. They argue that *Scheidler* reinforces their proposition that a loss of control over one's property is not a

44

2.

With respect to Defendants' second argument, we do not find that our decision in *Zauber* is inconsistent with our analysis of this case. In *Zauber*, 857 F.2d at 140-41, the administrators of an employee pension fund were charged with mail and wire fraud for causing the pension fund to invest money in an entity whose principals then paid kickbacks to the administrators. In support of its indictment, the Government argued, *inter alia*, that

sufficient deprivation to satisfy the mail fraud statute.

In *Scheidler*, the National Organization of Women ("NOW") sued abortion protesters under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(a), (c), and (d), for "engaging in a nationwide conspiracy to shut down abortion clinics through 'a pattern of racketeering activity' that included acts of extortion in violation of the Hobbs Act, § 1951." NOW argued that the defendants violated the Hobbs Act by depriving abortion clinics of the right to control what medical services they offered to women. The Supreme Court rejected that argument. It found undisputed that the defendants had "interfered with, disrupted, and in some instances completely deprived [abortion clinics] of their ability to exercise their property rights." 537 U.S. at 404. The Court held, however, that such conduct did not violate the Hobbs Act because the defendants did not actually "obtain" or "acquire" the clinics' property. *Id.* at 405.

We do not find *Scheidler* applicable to this case because of a crucial distinction between the Hobbs Act and the mail fraud statute. Unlike the mail fraud statute, the Hobbs Act expressly requires the Government to prove that the defendant "obtain[ed] property from another." 18 U.S.C. § 1951(b)(2) (defining the term "extortion"). As we discuss above, however, a mail fraud violation may be sufficiently found where the defendant has merely deprived another of a property right.

45

the pension fund suffered an actual loss of money or property because the pension fund was deprived of control over its money. Our Court, focusing on a footnote in *McNally*, reasoned that the footnote "suggests . . . that such a theory is too amorphous to constitute a violation of the mail fraud statute as it is currently written." *Id.* at 147. Defendants argue that if the pension fund's loss of control over its money did not constitute a mail fraud violation in *Zauber*, then ETS's loss of control over who may take the TOEFL exam and receive a score report also cannot constitute a mail fraud violation.

There is a crucial distinction, however, between the loss of control we addressed in *Zauber* and ETS's deprivation in this case. In *Zauber*, the defendants were officers of the pension fund whom we recognized had the power and authority to invest the fund's money. The purported loss of control that we addressed in that case was the defendants' assertion of control over the pension fund's money that the pension fund itself might not otherwise have made. *See id.* at 146. Here, however, the asserted deprivation is not merely that ETS would have chosen to control its property in a manner different from Defendants. Rather, the deprivation in this case is identical to that asserted in *Carpenter*, *i.e.*, the deprivation of ETS's right to *exclusive* use of its property.

Remarkably, Defendants also contend that the Supreme Court rejected the "loss of control" theory in *Cleveland*. As noted above, the Court indeed held that Louisiana's right to control its issuance of state licenses was not a property right recognized under the mail fraud statute. That holding, however, was expressly premised on the fact that such control "amount[ed] no more and no less than Louisiana's sovereign power to regulate." 531 U.S. at 23. There is no suggestion in *Cleveland*, especially given the Court's holding in *Carpenter*, that the Court's reasoning with respect to the State of Louisiana could be extended to the property interests of private entities. We therefore reject Defendants' reliance on *Cleveland*.

46

Defendants also attribute significance to the fact that ETS was fully paid for access to the TOEFL exam and receipt of the score report. They cite to *Cleveland* for the proposition that since ETS was paid in full, it could not have been deprived of any money or property. This reference to *Cleveland*, however, is misleading. As noted above, the Court in *Cleveland* rejected the Government's argument that Louisiana's video poker license constituted property merely because of the state's large economic stake in the industry. 531 U.S. at 22. After rejecting that argument, the Court stated:

> Tellingly, as to the character of Louisiana's stake in its video poker licenses, the Government nowhere alleges that Cleveland defrauded the State of any money to which the State was entitled by law. Indeed, there is no dispute that TSG paid the State of Louisiana its proper share of revenue, which totaled more than $1.2 million, between 1993 and 1995. If Cleveland defrauded the State of "property," the nature of that property cannot be economic.

*Id.* This text, does not, contrary to Defendants' argument, suggest that a person has not been defrauded out of property so long as that property is fully paid for. Rather, we read this quoted text as referring to the uncontroversial proposition that, if the object of which the victim was alleged to have been defrauded was fully paid for, then the victim could not have been defrauded of any *money*. That does not end the inquiry, however, as to whether the victim was defrauded of the object itself.

Moreover, *Carpenter* makes clear that a financial loss is not a required element under the mail fraud statute. As our

47

discussion above indicates, the Supreme Court expressly rejected the argument that a scheme to defraud requires a monetary loss. 484 U.S. at 27. Rather, the Court found it sufficient that the Journal was defrauded of the right to exclusive use of its confidential business information.

The flaw in Defendants' argument is well-illustrated by the Second Circuit's decision in *United States v. Schwartz*, 924 F.2d 410, 421 (2d Cir. 1991). In that case, Litton Industries agreed to sell night vision equipment to the defendant, but conditioned the sale on a promise that the defendant would not violate the U.S. export law by reselling the equipment to undocumented foreign customers. The defendant agreed to the condition, paid for the equipment in full, received it, and then broke his promise. The defendant was then charged and convicted of wire fraud. On appeal, he argued that he had not defrauded Litton of the equipment because it suffered no economic harm. The Second Circuit rejected this argument, stating:

> [T]he fact that Litton was paid for its night vision goggles does not mean that Litton received all it bargained for. In fact, it did not. Litton insisted its product not be exported from the country illegally and defendants' conduct deprived Litton of the right to define the terms for the sale of its property in that way, and cost it, as well, good will because equipment Litton, a government contractor, sold was exported illegally. The fact that Litton never suffered – and that defendants never intended it – any pecuniary harm does not make the fraud statutes inapplicable. The record sufficiently demonstrates that Litton sold its products to appellants only because of their deceit and misrepresentations, which were offered as consideration for Litton to contract with them.

48

Hence, appellants' convictions for wire fraud against Litton should be affirmed.

*Id.* at 421; *see also Walker v. Galt*, 171 F.2d 613, 614 (5th Cir. 1948) ("'The vendor has the right to select the person to whom he will sell . . . . [F]raud may be predicated upon misrepresentations as to the identity of the purchaser . . . .'"). We agree with the Second Circuit's analysis. Accordingly, the only conclusion we draw from the fact that ETS was paid in full is that ETS was not defrauded of any money. This fact, however, bears no relevance to whether ETS was otherwise defrauded of its property.

IV.

Al Hedaithy's second primary argument on appeal challenges the sufficiency of the evidence upon which his conviction is based. We apply a "particularly deferential" standard of review with respect to a challenge to the sufficiency of evidence supporting a guilty verdict. *United States v. Cothran*, 286 F.3d 173, 175 (3d Cir. 2002) (quoting *United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998)). The verdict must be sustained if there is substantial evidence to support it. *Burks v. United States*, 437 U.S. 1, 17 (1978); *United States v. Beckett*, 208 F.3d 140, 151 (3d Cir. 2000). If "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," this Court will sustain the verdict. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see Cothran*, 286 F.3d at 175. We do not re-weigh the evidence presented at trial or reassess the credibility of the witnesses, *Glasser v. United States*, 315 U.S. 60, 80 (1942); *Cothran*, 286 F.3d at 175, and we will overturn a guilty verdict "only if no reasonable juror could accept the evidence as sufficient to support the conclusion of the defendant's guilt beyond a

49

reasonable doubt." *United States v. Coleman*, 811 F.2d 804, 807 (3d Cir. 1987).

Prior to his bench trial, Al Hedaithy stipulated to the facts alleged in his superseding indictment. Because we hold that the facts alleged in the indictment were sufficient to state a mail fraud violation, we must also conclude that the District Court's guilty verdict was based on sufficient evidence.

Al Hedaithy's arguments to the contrary are premised on suppositions that we have rejected above. For example, he argues that the Government presented no evidence that the alleged scheme was designed to obtain any property from ETS. As we have explained, however, the mail fraud statute does not require that a scheme be designed to obtain any property from the victim; rather it is sufficient that the scheme is designed to fraudulently deprive the victim of property or an interest in property. We therefore conclude that Al Hedaithy's argument is inapplicable with respect to ETS's confidential business information. We also believe his argument is inapplicable with respect to ETS's score reports because Al Hedaithy stipulated that the scheme was designed to obtain the TOEFL score reports.

Al Hedaithy also argues that the Government presented no evidence that he obtained from ETS, or deprived ETS of, it copyrights, trademarks, or goodwill. As noted above, however, such evidence was not necessary in order to sustain his conviction. Instead, the Government has sufficiently alleged, and the stipulations sufficiently support, theories of mail fraud liability based upon the deprivation of ETS's confidential business information and TOEFL score reports.

We agree with the Government that Al Hedaithy, in advancing this sufficiency of the evidence challenge, has merely restated his legal challenge to the sufficiency of his superseding indictment. We rejected those arguments above and we similarly reject them here.

50

V.

Finally, Al Hedaithy argues that the District Court erred in denying his motion for discovery to pursue a selective-prosecution claim.[22] The District Court's denial of discovery is reviewed for abuse of discretion. *See United States v. Berrigan*, 482 F2d 171, 181 (3d Cir. 1973). "An abuse of discretion exists where the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." *International Union, United Auto., Aerospace and Agr. Implement Workers of America, UAW v. Mack Trucks, Inc.*, 820 F.2d 91, 95 (3d Cir. 1987).

As we have noted above, the District Court assumed, without deciding, that Al Hedaithy had presented sufficient evidence to warrant discovery and such discovery would show that Al Hedaithy and approximately sixty related defendants were prosecuted selectively because they were of Arab and/or Middle Eastern descent. The Court concluded, however, that such a selective prosecution would survive an equal protection analysis. The District Court applied rational basis review, and concluded that "in making a prosecutorial decision to target Middle Eastern and Arab people for prosecution, I can't say is an irrational exercise of prosecutorial discretion." Accordingly, the District Court concluded that Al Hedaithy would not prevail on his selective-prosecution claim even assuming his discovery motion was granted. The Court therefore denied the motion.

The District Court erred in its belief that further equal protection analysis was required after assuming that discovery would reveal that the decision to prosecute Al Hedaithy was

---

[22]According to the Supreme Court, "[a] selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *United States v. Armstrong*, 517 U.S. 456, 463 (1996).

51

based upon his race or ethnicity. According to the Supreme Court, a prosecutor's discretion to enforce the law, though broad, is nonetheless constrained by the equal protection component of the Due Process Clause of the Fifth Amendment. *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (citing *Bolling* v. *Sharpe*, 347 U. S. 497, 500 (1954)). In accordance with this constraint, the Supreme Court has held that "the decision whether to prosecute may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'" *Id.* (quoting *Oyler v. Boles*, 368 U. S. 448, 456 (1962)). This holding indicates that an equal protection analysis is already incorporated into the Court's selective-prosecution jurisprudence, and, more importantly, that a prosecutorial decision made on the basis of race is *per se* unjustifiable. Accordingly, once a defendant adequately shows that the prosecutor's decision was based upon his race, the defendant has succeeded on his selective-prosecution claim and he is entitled to a proper remedy.[23] The District Court was therefore not entitled to assume, without deciding, that discovery would show Al Hedaithy was prosecuted on the basis of his Arab and/or Middle Eastern descent, without also holding that he had prevailed on his selective-prosecution claim.

For these reasons, we conclude that the District Court abused its discretion. This conclusion, however, does not end our analysis. The Government contends that, despite the District Court's error, its ultimate decision to deny discovery was correct. It insists that Al Hedaithy failed to satisfy the threshold showing necessary to entitle him to discovery on his selective-

---

[23]The precise nature and scope of that remedy, however, has not yet been delineated. *See Armstrong*, 517 U.S. at 461 n.2 ("We have never determined whether dismissal of the indictment, or some other sanction, is the proper remedy if a court determines that a defendant has been the victim of prosecution on the basis of his race.").

prosecution claim. According to the Government, it would have been error for the District Court to grant Al Hedaithy's discovery motion, and we should therefore affirm the Court's denial.

The record before us contains Al Hediathy's motion for discovery, as well as the documents that Al Hedaithy offered in support of his motion. Accordingly, we may independently review whether he was entitled to discovery. After conducting such a review, we agree with the Government that Al Hedaithy failed in any case to satisfy the substantial evidentiary threshold necessary to obtain discovery on his selective prosecution claim, and he therefore suffered no prejudice as a result of the District Court's abuse of discretion.

In *Armstrong*, the Supreme Court explained that in order to succeed in a selective-prosecution claim, "[t]he claimant must demonstrate that the federal prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" 517 U.S. at 465 (quoting *Wayte*, 470 U.S. at 608). To complement this "rigorous standard" for proving a selective-prosecution claim, the Supreme Court requires "a correspondingly rigorous standard for discovery in aid of such a claim." *Id.* at 468. The required threshold to obtain discovery is "'some evidence tending to show the existence of the essential elements of the defense,' discriminatory effect and discriminatory intent." *Id.* (quoting *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974)).

With respect to the first essential element – discriminatory effect – the Supreme Court requires the claimant to make a "credible showing" that "similarly situated individuals of a different race were not prosecuted." *Id.* at 465, 470. In *Armstrong*, the defendant, in furtherance of his selective-prosecution claim, supported his discovery motion with an affidavit from a paralegal in the Federal Public Defender's Office, as well as an accompanying study, indicating that "in every one of the [twenty-four] [21 U.S.C.] § 841 and § 846

53

cases closed by the office during 1991, the defendant was black." *Id.* at 459. The Supreme Court held that this study and affidavit did not meet the threshold standard of "some evidence" because these materials "failed to identify individuals who were not black and could have been prosecuted for the offenses for which respondents were charged, but were not prosecuted." *Id.* at 470.

In a subsequent decision, *United States v. Bass*, 536 U.S. 862, 863 (2002) (per curiam), the Court reiterated that a defendant must make a "credible showing" that similarly situated individuals of a different race were treated differently. In *Bass*, the evidence presented to support the discriminatory effect element were "nationwide statistics demonstrating that '[t]he United States charges blacks with a death-eligible offense more than twice as often as it charges whites' and that the United States enters into plea bargains more frequently with whites than it does with blacks." *Id.* In concluding that this was not sufficient "credible evidence," the Court stated:

> Even assuming that the *Armstrong* requirement can be satisfied by a nationwide showing (as opposed to a showing regarding the record of the decisionmakers in respondent's case), raw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants*. . . . Under *Armstrong*, therefore, because respondent failed to submit relevant evidence that similarly situated persons were treated differently, he was not entitled to discovery.

*Id.* at 863-64.

Applying the standard set forth by the Supreme Court in *Armstrong* and *Bass* to this case, we conclude that Al Hedaithy

54

did not present sufficient credible evidence of discriminatory effect. The evidence that he did present was in the form of numerous newspaper articles.[24] According to Al Hedaithy, these

---

[24]These newspaper articles included: (1) an article quoting the director of test security at ETS as stating that, of the 800,000 people who sit for the TOEFL exam each year, less than 1% are found to have cheated, *see* William Branigin, *Testing Probe Turns to Terrorist Links*, Wash. Post, May 28, 2002, at B05; (2) an article stating that "three times in the past 10 years, Chinese students were disqualified en masse from [TOEFL], and the Graduate Record Exam, or GRE," Daniel Walfish, *A School for Scandal*, Far Eastern Economic Review, Nov. 16, 2000, at 78; (3) an article quoting a university administrator noting that "cheating on the TOEFL is 'fairly common,' but has never in his memory resulted in criminal charges," Susan Greene, *5 Arrested in Scam to Pass Exams*, Denver Post, May 8, 2002; (4) an article reporting that NBA basketball player Jayson Williams had arranged for someone else to take his SATs, *see* Shaun Assael, *ad Blood*, ESPN The Magazine, Aug. 2002; and (5) two articles reporting that several expert test takers had orchestrated a scheme to take the TOEFL on the East Coast, report the results to confederates who encoded them on pencils, and then sold the encoded pencils to customers who took the test later that day on the West Coast. The articles stated the Government brought charges against the expert test takers, but they did not indicate the customers were prosecuted. *See* Fiona Havers, *Testing Fraud Exposed: GRE, GMAT, TOEFL Cheating Scam Uncovered*, Yale Herald, Oct. 31 1996; Rose Kim, *Man Arrested in Test Cheating Scheme*, Newsday, Oct. 29, 1996, at A27.

Al Hedaithy's Supplemental Appendix also contains two additional newspaper articles that were published after the District Court's denial of his discovery motion. While our Court may normally take judicial notice of newspaper articles, *see*

55

articles demonstrate that at least several thousand people cheat on the TOEFL exam each year, yet, with the exception of Al Hedaithy and the approximately sixty related Arab and/or Middle Eastern defendants who participated in the relevant scheme, the Government has never before prosecuted such cheaters for any offense. The defect in Al Hedaithy's proffer is that none of this evidence indicates that *similarly situated* persons were treated differently. Demonstrating that thousands of other people have also cheated on the TOEFL exam does nothing to identify persons who are similarly situated. It is not possible to tell, from the evidence presented by Al Hedaithy, whether the thousands of people who cheat on the TOEFL exam each year are involved in widespread conspiracies, or have paid someone else to take the exam for them. Al Hedaithy, who paid an imposter to take the TOEFL exam so that he could obtain admission to an educational institution and remain eligible to reside legally in the United States, is not similarly situated with a hypothetical individual who cheats by merely copying his neighbor's answers. Nor is Al Hedaithy similarly situated with one who has not engaged in a scheme involving approximately sixty other foreign nationals attempting through fraud to maintain their residency in the United States. In short, Al Hedaithy presented no evidence indicating that the Government has ever uncovered a similar mail fraud scheme involving persons who were not Arab and/or Middle Eastern, but did not prosecute them. Accordingly, we conclude that Al Hedaithy did not present sufficient "credible evidence" of discriminatory

*Ieradi v. Mylan Laboratories, Inc.*, 230 F.3d 594, 598 n.2 (3d Cir. 2000), the issue before us is not whether these articles exist or whether they contain reliable information. Rather, we must determine whether the evidence actually presented to the District Court was sufficient to order discovery. Accordingly, we do not consider these extra-record materials.

56

effect.[25]    He was therefore not entitled to discovery on his selective-prosecution claim.

Because Al Hedaithy was not otherwise entitled to discovery, we will not reverse the District Court's denial of his discovery motion.

## VI.

For the foregoing reasons, the judgments of the District Court will be affirmed.

---

[25]We therefore need not address the discriminatory motive element.